UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>-v.-<br><br>MOHAMED HASSAN,<br><br>        Defendant. | Motion for Acquittal<br><br>22 cr. 464 (AMD) |

 

## MEMORANDUM OF LAW IN SUPPORT OF
## MR. MOHAMED HASSAN'S MOTION FOR ACQUITTAL

 

                                                  Varghese & Associates, P.C.
                                                  2 Wall Street
                                                  New York, NY 10005
                                                  (212) 430-6469
                                                  info@vargheselaw.com

                                      By:    Vinoo P. Varghese
                                                  Stephen Chahn Lee (of counsel)
                                                  Dennis J. Ring (of counsel)

                                                  *Counsel for Mr. Mohamed Hassan*

## PRELIMINARY STATEMENT

Mr. Hassan respectfully requests this Court to enter a judgment of acquittal on all counts under Federal Rule of Criminal Procedure 29.

Much of this trial wasn't disputed. Leticia Smith ("Smith") illegally wrote oxycodone prescriptions that she sold to Michael Kent ("Kent") and others. Kent took those prescriptions to multiple pharmacies around New York and Bassam Amin ("Amin") and Omar El-Sayed ("El-Sayed") were two of the pharmacists who took bribes while filling those prescriptions and handing the oxycodone to Kent.

As for Mr. Hassan, most facts weren't disputed. He did not personally fill any of the oxycodone prescriptions in 2022, the time period that was the core of the government's case. Mr. Hassan did have an encounter with Kent at Amin's pharmacy one time in 2022. And Mr. Hassan did have an ownership stake in many pharmacies, including the pharmacy in Staten Island and two other pharmacies where the pharmacists did fill improper prescriptions written by Smith, whom he did have a few calls with.

The core issue that was disputed was whether Mr. Hassan knew that Amin, El-Sayed, and Youssef Ennab ("Ennab") were illegally filling oxycodone prescriptions. On this point, there was insufficient evidence to support guilty verdicts. For the reasons discussed below, the case against Mr. Hassan–and *just* Mr. Hassan–comes down to the line between "permissive inference and impermissible speculation." *United States v. Pauling*, 924 F.3d 649, 662 (2d Cir. 2019). There were no wiretaps showing Mr. Hassan talking with Kent or Smith, no text messages showing Mr. Hassan communicating with Kent or Smith, and there were significant omissions in the testimony of Smith and Amin.

1

Ultimately, this was a case where "only surmise and guesswork," *id.*, could have led a jury to conclude that Mr. Hassan had knowledge that two or three pharmacists out of his many pharmacies were <u>not</u> just dispensing medication to people associated with Kent, but were *illegally* dispensing oxycodone to Kent. Kent's criminal interactions with pharmacists working for Mr. Hassan without proof of Mr. Hassan's knowledge that Kent and two, possibly three pharmacists were engaged in illegal transactions isn't enough to convict. Thus, the Court should vacate the convictions and enter acquittals.[1]

**I.    STANDARD**

Under Federal Rule of Criminal Procedure 29, a court can enter a judgment of acquittal only if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (quoting *United States v. Moore*, 54 F.3d 92, 100 (2d Cir. 1995)).

In conducting its analysis, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). Significantly, "[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *Pauling*, 924 F.3d at 656. By contrast, "impermissible speculation" is a "complete absence of probative facts to support the conclusion reached." *Id*. While a Court must "defer to a jury's reasonable inferences," it should give "no deference to impermissible speculation." *Id*.

---

[1] Mr. Hassan also incorporates co-defendant Ennab's arguments regarding the problems in the government charging separate conspiracies involving dispensing and distributing. *See* Docket 394 at 5-15.

The Second Circuit discussed the differences between inference and speculation in *Pauling*, a case where the Second Circuit found that the government had failed to prove drug quantity beyond a reasonable doubt.

> The line between permissible inference and impermissible speculation "is drawn by the laws of logic" and not "judicial idiosyncrasies." As the Supreme Court has instructed, "the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." Thus, in a criminal case, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt.' "
>
> At times it may be difficult to distinguish between inference and speculation, as some speculation may indeed be reasonable. Reasonable speculation occurs when the finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the conclusion reached is nevertheless unreasonable because it is not logically based on another fact known to exist. Indeed, we "may not credit inferences within the realm of possibility when those inferences are unreasonable."
>
> "[W]here a fact to be proved is also an element of the offense -- here, [drug quantity] -- it is not enough that the inferences in the government's favor are permissible. We must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." "[I]t would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty."

*Id*. at 656-57 (internal citations omitted) (emphasis in original).

## II.    ARGUMENT

While the government's evidence may have been enough for a jury to conclude that Mr. Hassan *possibly* or even *probably* had knowledge of the conspiracy, its evidence was insufficient to support such speculative conclusions. As discussed below, the government's evidence fell short of what would have been sufficient for a reasonable jury to conclude, based on the evidence, that Mr. Hassan knew that pharmacists at three of his pharmacies were illegally dispensing oxycodone to Kent.

3

### A.     Amin's Testimony About Conversations With Mr. Hassan

Significantly, despite years of knowing and working with Mr. Hassan, Amin <u>never</u> testified on direct examination that he had a conversation with Mr. Hassan about Kent's improper oxycodone prescriptions.

Amin testified that he first encountered Kent at Nile RX Pharmacy after being introduced to him by "Jalal Jibril or one of the technicians who was working at the location." Tr. 1244. Notably, Amin didn't say that Mr. Hassan was the one who introduced him to Kent. *Id*. Amin testified that he saw Kent pay cash while "getting some oxycodone prescriptions," though it wasn't clear whether the prescriptions were for Kent or for others. *Id*. Amin testified that he "suspected" Kent was bringing oxycodone prescriptions, though he apparently did <u>not</u> make any conclusions at the time. Tr. 1245.

When Amin encountered Kent again years later at Prospect Care pharmacy, Amin spoke *again* with Jalal Jibril ("Jibril"), a pharmacist at Nile RX. *Id*. Amin testified that Jibril "indicated that if you are willing to take Michael Kent and some of the patients that he brings [] [] to Prospect Care. And it looks like when I asked him [Jibril] what's going on, he [Jibril] said I cannot get [] the oxycodone for him [Kent]." *Id*.

Amin testified that he saw Mr. Hassan and Kent talk one time in person. Tr. 1252. This occurred in 2022 at Prospect Care pharmacy. Tr. 1253. Amin said, "It was on one occasion where Michael Kent came to pick up prescriptions, and Mohamed Hassan was with me in the back of the pharmacy, and then Michael Kent greeted Mohamed Hassan." *Id*.

Significantly, there was *no* testimony about what Kent and Mr. Hassan discussed during this chance meeting. While the evidence does support an inference that Kent and Mr. Hassan recognized each other, it is entirely speculative why they recognized each other and what they discussed. BNE data shows that Michael Kent was himself a patient of Nile RX, and thus he would

4

have picked up prescriptions for himself at Nile RX. If Mr. Hassan recognized Kent in that regard, there would have been nothing improper and no basis to conclude that Mr. Hassan knew what else Kent was doing. It is entirely speculative to assume that Mr. Hassan recognized Kent in any other regard, especially given the lack of evidence showing any contact between Mr. Hassan and Kent other than this one chance meeting.

The government asked Amin about only two specific conversations between him and Mr. Hassan relating to Kent.

First, Amin testified that he did have a discussion with Mr. Hassan about Kent regarding highly reimbursable items.

> In general, when Michael Kent start coming to the pharmacy, we were -- Mohammad Hassan recommended that we ask him to bring in some medication that are highly reimbursable or ask him to bring in -- or ask for prescriptions for surgical equipment, such as back braces, hand braces, or leg injuries that associated with the prescription that he's bringing. This is something that will be beneficial to the pharmacy.

Tr. 1265.

Second, Amin testified that he had conversations with Mr. Hassan about Kent's patients not having insurance.

> Q: What conversations, if any, did you have with Mr. Hassan regarding creating insurance profiles from Kent's patients?
>
> A: I called Mohammad Hassan on several occasions about Michael Kent's patients who are coming to the pharmacy and they do not have insurance. So he came into the pharmacy and showed me how to create a fake insurance profile for that person who does not have insurance.

Tr. 1273.

Such testimony was enough to show that Mr. Hassan was aware that Amin was filling prescriptions related to Kent and to patients associated with Kent, but it wasn't enough to show

5

that Mr. Hassan was aware that Amin was filling *improper* oxycodone prescriptions for Kent. Significantly, with regards to the highly reimbursable items, Amin himself said that some of these items were associated with oxycodone prescriptions and some were not. Tr. 1265.

> Q: Based on your experience in this scheme, were any of those highly reimbursable substances typically associated with oxycodone prescriptions?
>
> A: Sometimes, not necessarily but on occasions, yes.

*Id*.

To be sure, Amin expressed his *belief* that Mr. Hassan was aware of the *illegal* prescriptions that Amin was filling for Kent. Tr. 1362. Thus, Amin's testimony overall was enough to establish that it was *possible* that Mr. Hassan knew about Amin illegally filling oxycodone prescriptions for Kent, and it may have been enough to establish Mr. Hassan *probably* knew. Nevertheless, as the Second Circuit said in *Pauling*, neither *possible* knowledge nor *probable* knowledge are enough to establish Mr. Hassan's role as a co-conspirator.

*If* Amin had testified that he had told Mr. Hassan that Kent was paying cash so that Amin would fill prescriptions that he otherwise would not fill, or *if* Amin had testified that he had told Mr. Hassan that he was giving oxycodone to Kent based on prescriptions for multiple patients that had been written by Dr. Ratanaprasatporn, that would have established sufficient facts for the government to have met its burden under Rule 29. But Amin didn't give such testimony, and it would have been speculation for the jury to fill in the gaps in his testimony as the government requested.

**B.    Smith's Testimony About Conversations With Mr. Hassan**

Similarly, Smith never testified on direct examination that she had a conversation with Mr. Hassan about illegally prescribing oxycodone in 2022, the main time period in this case.

6

Smith said that she talked with Mr. Hassan about only one specific patient, Patient Myrtle Caldwell ("Caldwell"). Tr. 688-90. Smith said that she believed Patient Caldwell needed the oxycodone and wasn't working for Kent. Tr. 604.

Such testimony was enough to show that Mr. Hassan was aware that Smith was involved in writing prescriptions, but it was not enough to show that he knew that Dr. Ratanaprasatporn wasn't writing prescriptions for patients and that Smith was writing them herself. Office managers can be legitimately involved in the process of writing a prescription to the extent that a request is made to an office manager who takes the request to the doctor. Critically, no evidence indicated that Smith ever revealed to any pharmacist that she was not even taking the prescriptions to the doctor and was issuing them herself.

Even the evidence about prior authorizations did not establish that Smith was writing prescriptions herself. Amin testified that Mr. Hassan "would do" a prior authorization, Tr. 1281, and Mr. Hassan wrote in a text message that he would "work on the prior authorization tomorrow" for a patient. Tr. 1281-82. But there was no evidence what this meant. It would not be illegal for Mr. Hassan to draft a prior authorization for a doctor to review and sign if the doctor believed the prescription to be proper. It would be illegal for Mr. Hassan to draft a prior authorization and sign it for the doctor without the doctor's knowledge. There was no testimony establishing what Mr. Hassan *actually* did, and it accordingly would be speculative to conclude that Mr. Hassan acted improperly or had knowledge about Smith's practices based on this.

Smith's testimony overall was enough to establish that it was *possible* that Mr. Hassan knew about Smith illegally writing oxycodone prescriptions for Kent's patients. But that, as the Second Circuit said in *Pauling*, isn't enough, especially when Smith herself said that she did not come up with a plan for a criminal conspiracy in any of their calls in 2022. Tr. 697.

7

### C. Smith's Testimony About Conversations With A Nile RX Pharmacist

Smith did testify about a prior conversation with a pharmacist that would be enough to show that this pharmacist knew that Smith was working with Kent and that the resulting oxycodone prescriptions were illegal. But there was insufficient evidence to support a conclusion that this pharmacist was Mr. Hassan.

Smith said that she did recall talking with the pharmacist from Nile RX. Tr. 408. Smith did not identify a time for this call, but it presumably occurred sometime between March 2019 and April 2020, the period in which Nile RX filled oxycodone prescriptions by Dr. Ratanaprasatporn. Smith said that the pharmacist told her "that whenever I send a prescription over to the pharmacy, to make sure that I send other prescriptions with it, whether it be a stool softener, an anti-inflammatory, vitamins. But other medications had to be sent to the pharmacy along with the oxycodone 30 milligrams because if it didn't, it could get red-flagged." Tr. 408.

When asked about the conversation, Smith said that the pharmacist at Nile RX, whom she believed to be Mohamed 1, had "an Indian accent." Tr. 670. Later, she said that the accent was "not really a heavy Indian accent" but was "just a different accent." Tr. 757.

When asked how she knew the Nile RX pharmacist to be Mohamed 1, she did not say that she recognized the voice of Mohamed 1 to be the same as the voice of the person she spoke to once years earlier. Tr. 760. She testified "[b]ecause even when – when I got the phone call, he told me – I didn't know how he received my phone – how he got my phone number, but when he called my cell phone, he told me, Ms. Leticia, do you remember me, I am Mohamed from Nile RX." Tr. 760.

Overall, the evidence was sufficient for a reasonable jury to conclude that Smith *believed* that Mr. Hassan was the pharmacist at Nile RX whom she spoke with because Mr. Hassan introduced himself in May 2022 as having been the pharmacist at Nile RX. But there were other

8

pharmacists who worked at Nile RX in that period. *See* Tr. 1228 and 1244, Gov. Ex. 294 (listing Mr. Hassan, Jibril, and another pharmacist). While the Court must assume for purposes of Rule 29 that Smith *believes* that Mr. Hassan was the pharmacist whom she spoke with in 2019-20, her belief is not enough to support a conclusion that Mr. Hassan actually was that pharmacist.

Moreover, this issue affected the government's summation in significant ways. Based on Smith's belief that Mr. Hassan was the pharmacist that she spoke with at Nile RX, the government argued multiple times that Mr. Hassan personally filled some improper prescriptions at Nile RX:

- "Mr. Hassan himself was filling some of the Linden Medical prescriptions at one of those pharmacies." Tr. 1910.

- "At Nile RX, Mr. Hassan told Smith that he needed her to add non-controlled prescriptions to the Linden Medical oxy prescriptions because the sale of solo oxy scripts was a red flag. You heard that correctly. From the beginning, Mr. Hassan knew that the oxy scripts from Kent were rotten, and Mr. Hassan didn't care. He just wanted to hide the stench." Tr. 1914.

- "By the time Ennab was giving out these pills, Mr. Hassan didn't need to be at the counter anymore. Mr. Hassan was a silent partner but he was no less a part of that scheme. Imagine going out for dinner and you walk in and talk to the host. You sit down, meet the waiter, give your order and get served food by that waiter. You eat and you pay. At no point did you see the chef. At no point did you talk to that chef. But in what world was a chef not involved in preparing your meal? And the chef here in this case *previously* filled the problematic oxy scripts himself." Tr. 1946 (emphasis added).

Even if Smith's belief that Mr. Hassan was the Nile RX pharmacist she spoke with in 2019 or 2020, there was no evidence that Mr. Hassan actually filled any of the oxycodone prescriptions that were filled at Nile RX and that were distributed in circumstances that would have raised red flags. Amin himself identified multiple people who worked there – Jalal Jibril (Tr. 1228), Adham (Tr. 1233), maybe Ennab (Tr. 1240), Islam (Tr. 1242), and himself (Tr. 1244). But Amin never testified that Mr. Hassan ever worked at Nile RX, and there was no evidence that Mr. Hassan illegally filled any oxycodone prescriptions there or whether the circumstances for any such instances were enough to raise red flags.

9

Again, while it was *possible* that Smith had a discussion in 2019 or 2020 with Mr. Hassan that would show sufficient knowledge of her working with Kent, that is not enough. And even if it is *possible* that Mr. Hassan personally filled some prescriptions improperly in 2019 or 2020, that was an unreasonable conclusion as it is entirely based on a speculative premise. *See, e.g., United States v. Guadagna*, 183 F.3d 122, 133 (2d Cir. 1999) (affirming district court's finding that there was insufficient evidence to support a wire fraud count because inferring the defendant's knowledge at a particular time based on evidence that was a "slim reed" "requires too great an inferential stretch"). *See also United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) ("if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt").

Ultimately, Smith's belief that Mr. Hassan was the Nile RX pharmacist she spoke with in 2019 or 2020 is not sufficient to conclude that Mr. Hassan actually was. Nor is it sufficient to conclude that Mr. Hassan had sufficient knowledge. And it is definitely not sufficient to conclude that Mr. Hassan personally filled improper prescriptions, as the government argued in summation.

### D.     Testimony About Conversations With Kent About Staten Island

Smith testified that at some point in 2022, when the weather was warmer, Kent asked Smith to send prescriptions to Forest Care Pharmacy. Tr. 457. Smith testified that she expressed concern about sending prescriptions to a pharmacy in Staten Island because Dr. Ratanaprasatporn lived in Staten Island. *Id*. According to Smith, Kent replied that she should not worry about it because he said that "Mohamed from Downtown told him that it wouldn't be a problem, that that was his cousin." *Id*.

Overall, this evidence was enough to show that Mr. Hassan had discussed with Kent sending some patients' prescriptions to Forest Care Pharmacy. But there was *no* evidence as to

10

what patients or prescriptions were discussed or whether there was any discussion about sending *improper* oxycodone prescriptions to Forest Care Pharmacy.  The evidence may have been enough to show that Mr. Hassan *possibly* or even *probably* knew that Kent was going to have illegal oxycodone prescriptions filled at Forest Care, but that isn't enough.

### E. Text Messages With El-Sayed

Text messages between Mr. Hassan and El-Sayed show that Mr. Hassan knew that Kent had sent some patients to Downtown Pharmacy, and they show that Mr. Hassan knew that Smith separately had sent some patients to Downtown Pharmacy.  But they do not show that Mr. Hassan knew that Kent and Smith were working together or that Kent's patients were Smith's patients.

On August 24, 2022, El-Sayed wrote, "Michael sent 3 other patients."  That same day, Mr. Hassan recommended that El-Sayed should "get maybe 3-4 more from dr somsri" and wrote, "and that's about it."  El-Sayed would have interpreted the two statements to be the same thing because he was the one who saw the prescriptions and saw Kent pick up the oxycodone, but there was no evidence that Mr. Hassan knew Dr. Ratanaprasatporn's patients were the same as Kent's patients.

Similarly, on August 26, Mr. Hassan wrote to El-Sayed, "Plz call Letisha, see if she has more patients for you, tap[] into every resource."  On September 1, El-Sayed wrote, "I got 5 new pts from Leticia yesterday.  Too many."  Again, El-Sayed knew that Smith was working with Kent because he was the one who saw the prescriptions and saw Kent pick up the oxycodone, but there was no evidence that Mr. Hassan knew this key fact.

Ultimately, the text messages were enough to establish that it was *possible* that Mr. Hassan knew that Smith and Kent were working together to send illegal oxycodone prescriptions to the pharmacy where El-Sayed worked.  The text messages may even have been enough to establish Mr. Hassan *probably* knew.  But that, as the Second Circuit said in *Pauling*, is not enough.

11

### F. Ownership Evidence

The government argued in closing that there was "overwhelming evidence that Mr. Hassan exercised control over his dirty pharmacies. He ran them like a crime boss, while the supervising pharmacists handled the day to day." Tr. 1921. But control is <u>not</u> knowledge.

The government did present sufficient evidence to show that Mr. Hassan had an ownership stake in Prospect Care Pharmacy, Forest Care Pharmacy, and Downtown RX Pharmacy, as well as in other pharmacies that filled some of the illegal oxycodone prescriptions at issue here. The government also presented evidence to show that Mr. Hassan checked in with his pharmacists regularly, was involved in the pharmacies' operations, and that he had access to the pharmacies' systems. *See, e.g.*, Tr. 1237, 1339 (Mr. Hassan "was involved in directing the pharmacist, the staff, staffing the location, dictating to the pharmacist what to do, where to do, and how to do"). And the government presented evidence that, after the arrests of Amin, El-Sayed, and Ennab, Mr. Hassan was concerned about what to do with the related pharmacies and that he thought *someone* may have been blinded by greed. Tr. 1534.

But this only establishes that Mr. Hassan was an owner who was not silent and who is not completely oblivious to reality, <u>not</u> that he knew that everything that the pharmacists knew and did *before* the arrests. *Amin* knew that he was illegally dispensing oxycodone to Kent because he *personally* saw multiple prescriptions by Dr. Ratanaprasatporn for multiple patients associated with Kent, because he *personally* filled those prescriptions, because he *personally* gave the oxycodone to Kent, and because he *personally* took cash from Kent. But *Mr. Hassan* did not see the prescriptions, he did not give any oxycodone to Kent, and he did not take cash from Kent.

If the jury concluded that Mr. Hassan knew what Amin was doing because he was a part owner with Amin in Prospect Care and because Mr. Hassan may have received some of the proceeds from Amin's dealings with Kent, that would be improper speculation.

12

Ultimately, the ownership evidence was enough to establish that it was *possible* that Mr. Hassan knew that Smith and Kent were working together with Amin, El-Sayed, and Ennab. But that, as the Second Circuit said in *Pauling*, is not enough.

### G. Other Evidence

As the Court is well aware, the government presented lots of evidence about Mr. Hassan being engaged in practices involving *other* medications that it believes are improper. Whether such practices are indeed improper, and whether they were properly admitted for some purpose under Rule 404(b), such evidence cannot be considered for the core issue in this case–Mr. Hassan's knowledge. As the Court is aware, the Court didn't instruct the jury that it could consider the evidence of uncharged conduct for knowledge or state of mind. Accordingly, all such evidence should <u>not</u> be considered here.

In any event, even if the Court were to consider such evidence, it would be speculative to leap from Mr. Hassan's willingness to engage in one potentially improper practice (asking doctors to order additional medications for patients) to assuming that Mr. Hassan knew that Smith was issuing oxycodone prescriptions without the doctor's involvement.

### III. CONCLUSION

Ultimately, the government presented lots of evidence in this trial, but very little about the core disputed issue–Mr. Hassan's knowledge that two, perhaps three of his many pharmacists at his many pharmacies were filling illegal oxycodone prescriptions for Kent and Smith. The evidence presented on this core issue was vague, and the conclusions that the government asked the jury to reach were possible but not more than that. In the end, only "surmise and guesswork" could fill in the gaps in the government's evidence, *United States v. Pauling*, 924 F.3d at 662, and this is not enough.

13

Accordingly, the Court should enter a judgment of acquittal on all counts for Mr. Hassan.

Dated: May 12, 2025
New York, NY

                                            Respectfully submitted,

                                            Varghese & Associates, P.C.
                                            _____/s_____

By:   Vinoo P. Varghese
       Stephen Chahn Lee (of counsel)
       Dennis J. Ring (of counsel)

*Counsel for Mr. Mohamed Hassan*

14