UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     -v.-

MOHAMED HASSAN,

           Defendant.

22 cr. 464 (AMD)

## MR. MOHAMED HASSAN'S SENTENCING MEMORANDUM

Varghese & Associates, P.C.
By:   Vinoo P. Varghese
       Dennis J. Ring (*of counsel*)
       2 Wall Street
       New York, NY 10005
       (212) 430-6469
       info@vargheselaw.com

       *Counsel for Mr. Mohamed Hassan*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................... 1

I.     THE OFFENSE ............................................................................................................. 2

II.    THE COURT SHOULD IMPOSE A SENTENCE OF TIME SERVED BECAUSE SUCH
       A SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO
       COMPORT WITH THE PURPOSES OF SECTION 3553(a)......................................... 2

       A.     Under Section 3553(a)(1) The Court Should Impose A Sentence Of Time Served
              Based On The Nature And Circumstances Of Mr. Hassan's Offenses And His
              History And Characteristics ...................................................................................... 3

              1.     Sentencing Mr. Hassan to a sentence greater than time served would not
                     adequately achieve the goals of sentencing—accordingly, the Guidelines range
                     of 324 to 405 months and Probation's recommended sentence of 240 months
                     are substantively unreasonable; ....................................................................... 3

              2.     Despite his immense wealth and an absurdly high Guidelines calculation of
                     nearly 34 years' prison, Mr. Hassan has chosen not to run but to face his
                     sentence…………………………………………………………………….3

              3.     Mr. Hassan presents no recidivism risk ........................................................... 3

              4.     Mr. Hassan's philanthropy—having donated over two million dollars of his
                     wealth and his extraordinary record of service—is a basis for a sentence below
                     the Guidelines range…………………………………………………………..4

       B.     Under Section 3553(A)(2) Time Served Sufficiently 1) Reflects The Seriousness
              Of The Offenses, Promotes Respect For The Law, And Provides Just Punishment
              For The Offense; 2) Mr. Hassan Maintains His Innocence In The Immediate Matter
              And Will Not Commit Any Crimes, And Thus There Is No Concern About
              Protecting The Public From Future Crimes ........................................................... 12

              1.     Mr. Hassan has been consistently employed.................................................... 12

              2.     Mr. Hassan's leadership as a small business owner has improved the local
                     economies of Brooklyn, Staten Island, and Queens ....................................... 13

              3.     Mr. Hassan uses his pharmaceutical background, along with his natural
                     compassion, to help many................................................................................. 14

              4.     Mr. Hassan's impact on his community is demonstrated by the 177 support
                     letters counsel received, 33 of which we have attached for the Court, including
                     those from religious and community leaders, and New York City Council
                     member for Bay Ridge Justin Brannan............................................................. 18

              5.     Mr. Hassan is the bedrock of his family .......................................................... 22

              6.     Mr. Hassan is committed to continuing his life of honest and industrious
                     work…………………………………………………………………………..25

       C.     The U.S.S.G. Section 2D1.1(b)(1) Table Is An Improper Benchmark By Which To
              Fashion Mr. Hassan's Sentence .............................................................................. 25

III.   PSR OBJECTIONS AND REQUEST FOR A *FATICO* HEARING ............................... 28

IV.    REQUEST FOR A FORFEITURE HEARING................................................................ 29

CONCLUSION.................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

Kimbrough v. United States, 128 U.S. 574 (2007)........................................................25

United States v. Booker, 543 U.S. 220 (2005)..............................................................3

United States v. Cavera, 550 F.3d 180 (2d Cir. 2008)................................................25

Gall v. United States, 552 U.S. 38 (2007)……………………………………………..3

United States v. Helding, 948 F.3d 864 (7th Cir. 2020)...............................................25

United States v. Rollerson, 7 F.4th 565 (7th Cir. 2021)..............................................25

United States v. Tucker, 404 U.S. 443 (1972).............................................................25

Williams v. New York, 337 U.S. 241 (1949)..................................................................3

**Statutes**

18 U.S.C. § 3553(a).....................................................................................................1, 3

18 U.S.C. § 3553(a)(1)...................................................................................................3

18 U.S.C. § 3553(a)(2)(A)..............................................................................................2

21 U.S.C. § 841(b)(1)(C)................................................................................................2

21 U.S.C. § 846..............................................................................................................2

Supp. to U.S.S.G. App. C, Am. 793.............................................................................27

U.S.S.G. § 2D1.1...........................................................................................................26

U.S.S.G. § 2D1.1 Application Note 8(D).....................................................................26

U.S.S.G. § 2D1.1(b)……...............................................................................................26

U.S.S.G. § 2D1.1(b)(1)..................................................................................................26

U.S.S.G. § 2D1.1(c)……...............................................................................................26

U.S.S.G. § 2D1.1(c)(3)..................................................................................................26

**Other Authorities**

*Amendment 793*. Available at https://www.ussc.gov/guidelines/amendment/657. UNITED STATES SENTENCING COMMISSION, November 1, 2003.............................................26

*Annual Determination of Average Cost of Incarceration Fee (COIF)*. Available at https://www.federalregister.gov/documents/2023/09/22/2023-20585/annual-determination-of-average-cos… FEDERAL REGISTER, September 22, 2023……………………………....4

*Are fentanyl overdose deaths rising in the US?* Available at https://usafacts.org/articles/are-fentanyl-overdose-deaths-rising-in-the-us/, USAFACTS, October 24, 2025..........................27

*Drug Overdose Deaths in the United States, 2003–2023*, available at https://www.cdc.gov/nchs/products/databriefs/db522.htm, NATIONAL CENTER FOR HEALTH STATISTICS, December 2024.................................................. ………………27

*Drug Scheduling*. Available at https://www.dea.gov/drug-information/drug-scheduling, UNITED STATES DRUG ENFORCEMENT ADMINISTRATION...................................................27

*HSI New York, Federal Partners Announce Charges Against 18 Defendants in Scheme to Manufacture, Distribute Millions of Deadly Counterfeit Pharmaceuticals Through Fake Online Pharmacies*. Available at https://www.ice.gov/news/releases/hsi-new-york-federal-partners-announce-charges-against-18-defenda…, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, October 1, 2024...................................................................................27

Through counsel, Mr. Mohamed Hassan respectfully submits this memorandum to assist the Court in determining an appropriate sentence. The proper sentence for Mr. Hassan—a non-violent, first-time offender of a victimless crime—is a below-guidelines sentence of time served. Such a sentence comports with 18 U.S.C. Section 3553(a) objectives.

In support of our request for a below-guidelines sentence of time served, we respectfully request the Court consider Mr. Hassan's history and character as well as the nature and circumstances of the conviction. Specifically, we respectfully request the Court consider the following:

1. sentencing Mr. Hassan to a sentence greater than time served would <u>not</u> adequately achieve the goals of sentencing—accordingly, the Guidelines range of 324 to 405 months and Probation's recommended sentence of 240 months is substantively unreasonable;

2. despite his immense wealth and an absurdly high Guidelines calculation of nearly 34 years' prison, Mr. Hassan has chosen not to run but to face his sentence;

3. Mr. Hassan presents no recidivism risk;

4. Mr. Hassan's philanthropy—having donated over two million dollars of his wealth and his extraordinary record of service—is a basis for a sentence below the Guidelines range;

5. Mr. Hassan has donated at least $2.17 million to charities and non-profit organizations;

6. Mr. Hassan's philanthropy extends far beyond financial support, encompassing years of service, labor, and care and an unwavering commitment to leading others through darkness, even when doing so requires extraordinary personal effort;

7. in particular, Mr. Hassan gives back tremendously to the Al Noor School;

8. Mr. Hassan has been consistently employed;

9. Mr. Hassan's leadership as a small business owner has improved the local economies of Brooklyn, Staten Island, and Queens;

10. Mr. Hassan uses his pharmaceutical background, along with his natural compassion, to help many;

11. Mr. Hassan's pharmaceutical background and natural compassion are informed by his witnessing of drug abuse within his family and broader community;

12. Mr. Hassan's witnessing of drug abuse encouraged him to lead his pharmacies through

1

compassion;

13. Mr. Hassan's compassion as a pharmacy owner inspired others working in pharmacies to provide the best possible care to patients;

14. Mr. Hassan demonstrated particular compassion for his pharmacies' patients during the Covid-19 pandemic—including when he educated his community on the safety of the Covid-19 vaccine;

15. Mr. Hassan's impact on his community is demonstrated by the 177 support letters counsel received, 33 of which we have attached for the Court, including those from religious and community leaders, and New York City Council member for Bay Ridge Justin Brannan;

16. Mr. Hassan is the bedrock of his family;

17. Mr. Hassan is a loving father to two young children, Emma and Faris, aged 5 and 7;

18. Mr. Hassan is the sole, dutiful caregiver to his parents—especially his 63-year-old father who suffers from deteriorating health conditions;

19. Mr. Hassan is committed to continuing his life of honest and industrious work; and

20. the U.S.S.G Section 2D1.1(b)(1) Table is an improper benchmark by which to fashion Mr. Hassan's sentence.

## I.    THE OFFENSE

On February 12, 2025, a jury convicted Mr. Hassan, a pharmacy owner, investor, and licensed pharmacist, on three counts of a nine-count indictment. *See* PSR at ¶ 1. Counts One and Six charged him with violating 21 U.S.C. §§ 841(b)(1)(C), 846 by conspiring, from December 2018 through October 2022, to distribute oxycodone. *See* id. at ¶ 2. Count Three charges that, in the same period, he violated the same statutes by actually distributing oxycodone outside the scope of professional practice and not for a legitimate medical purpose. *See* id. at ¶ 3.

Mr. Hassan maintains his innocence and will appeal his conviction.

## II.    THE COURT SHOULD IMPOSE A SENTENCE OF TIME SERVED BECAUSE SUCH A SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY TO COMPORT WITH THE PURPOSES OF SECTION 3553(a)

The Court should sentence Mr. Hassan to time served because, in this case, such a ruling is sufficient, but not greater than necessary to achieve Congress' sentencing goals. First, the Court should impose such a sentence based on the nature and circumstances of Mr. Hassan's offenses, as well as his history and characteristics. Next, under Section 3553(a)(2)(A), time served sufficiently reflects the seriousness of the offenses and promotes respect for the law. Mr. Hassan

has been under supervision for the past nineteen months and presents no risk of recidivism.

Probation has calculated a Guidelines range of 324 to 405 months' imprisonment and a recommended sentence of 240 months—the Court should reject both. *See* PSR Addendum at ¶ 109; *see also* Probation Sentencing Recommendation. Both the Guidelines range and Probation's recommendation are far greater than necessary to promote the goals of sentencing in this case. Both the Guidelines range and Probation's recommendation fail to account for Mr. Hassan's zero recidivism risk, history, and characteristics.

### A. Under Section 3553(a)(1) The Court Should Impose A Sentence Of Time Served Based On The Nature And Circumstances Of Mr. Hassan's Offenses And His History And Characteristics

The Court should impose a sentence of time served based on the nature and circumstances of Mr. Hassan's offenses and his history and characteristics.

#### 1. Sentencing Mr. Hassan to a sentence greater than time served would <u>not</u> adequately achieve the goals of sentencing—accordingly, the Guidelines range of 324 to 405 months and Probation's recommended sentence of 240 months are substantively unreasonable;

The Supreme Court has long acknowledged that modern penal philosophy tailors punishments to not just fit a crime, but also to fit the offender. *See* <u>Williams v. New York</u>, 337 U.S. 241 (1949). It has already been upheld that a court may not presume that a sentence that falls outside the range recommended by the Guidelines is unreasonable and that a district judge should consider all of the factors cited in Section 3553(a) to determine a reasonable sentence. *See* <u>Gall v. United States</u>, 552 U.S. 38 (2007). And, it has been concluded that the mandatory application of the sentencing guidelines is incompatible with the Sixth Amendment, and the Guidelines should be viewed as advisory. *See* <u>United States v. Booker</u>, 543 U.S. 220 (2005). Mr. Hassan's personal history and characteristics starkly contrast with the nature of the crime he was convicted of. Thus, he is worthy of such a below Guidelines sentence.

#### 2. Despite his immense wealth and an absurdly high Guidelines calculation of nearly 34 years' prison, Mr. Hassan has chosen not to run but to face his sentence.

For more than a year and a half, Mr. Hassan has met every obligation placed upon him. He has attended all his court appearances including three weeks of trial. Even after his conviction, despite his immense wealth and knowing the Guidelines call for a possible 34-year prison sentence, he has chosen to face his sentence and not run away. His conduct throughout is a testament to his respect for the American legal system.

#### 3. Mr. Hassan presents no recidivism risk

Mr. Hassan is a law-abiding citizen of the United States. Probation found that Mr. Hassan has a criminal history score of zero. *See* <u>id</u>. at ¶ 63. He has <u>no</u> other criminal conduct, <u>no</u> pending

charges, and <u>no</u> other arrests.  *See* <u>id</u>. at ¶ 64-66.  As objected by counsel, Mr. Hassan should receive a two-point zero offender deduction.  *See* PSR Objections (ECF No. 464).

Considering Mr. Hassan's lack of criminal history and his compliance with the court process throughout the entirety of the case, his risk of recidivism is none.  While pronouncing a sentence, we ask the Court to consider his zero risk of re-offense.  The Court should allow him to return to his family and resume contributing so positively to society.

In practical terms, any carceral sentence for Mr. Hassan would be financially wasteful. Federal prisons are funded with taxpayer dollars, and, according to the Federal Register, it costs the United States over $42,000 a year to house a single inmate.[1]  Further, losing Mr. Hassan to prison would cost his community incalculably more.

Mr. Hassan was convicted of a non-violent, victimless offense.  *See* PSR at ¶ 38 ("[t]here are no victims in this case…").  A sentence requiring *any* additional term of imprisonment would be disproportionate and counterproductive.  Allowing him to remain with his family and continue contributing to the community he has spent his life serving is not only fair but also is consistent with the purposes of sentencing and with the reality of who he is.

### 4. Mr. Hassan's philanthropy—having donated over two million dollars of his wealth and his extraordinary record of service—is a basis for a sentence below the Guidelines range

Courts have acknowledged that extraordinary charitable works and a life marked by service to others justify deviating from the Guidelines range.  In the Southern District of New York, Judge Jed Rakoff imposed a well-below-Guidelines sentence on Rajat Gupta expressly because Gupta's history of philanthropy revealed a character far more complex than his conviction.[2]  The same principle applies with force here.

### a. Over the past decade, Mr. Hassan has donated at least $2.17 million to charities and non-profit organizations

Although Mr. Hassan's philanthropy cannot be fully captured in numbers, the quantifiable portion alone is remarkable, especially for someone only 35-years-old.  He has donated the following.

- $500,000 to the Muslim Community Center of New York City, which is dedicated towards bridging the gaps, fostering effective communication, connecting families, and removing stigma surrounding mental health in the Muslim community;

---

[1] *Annual Determination of Average Cost of Incarceration Fee (COIF)*.  Available at https://www.federalregister.gov/documents/2023/09/22/2023-20585/annual-determination-of-average-cost-of-incarceration-fee-coif.  FEDERAL REGISTER, September 22, 2023. Last visited, August 7, 2025.

[2] *Rajat Gupta gets two years in prison for insider trading* by Grant McCool and Basil Katz; Reuters, October 25, 2012; available at https://www.reuters.com/article/world/rajat-gupta-gets-two-years-in-prison-for-insider-trading-idUSDEE89N0C5/.  Last visited August 18, 2025.

- $450,000 to the Islamic Society of Bay Ridge, which supports spiritual leadership and community engagement;
- $300,000 to the Bay Ridge Community Development Center, which supports a food pantry and youth programming;
- $275,000 to the Al Iman Center, a mosque and Islamic school in Brooklyn;
- $205,000 to the Al Noor School, Mr. Hassan's alma mater, a school committed to the pursuit of excellence in Islamic and academic studies;
- $200,000 to the Muslim American Society Staten Island Center, which provides a safe and dynamic environment for Muslim and non-Muslim youth;
- $150,000 to the Islamic Society of Allentown, which supports educational, religious, social, and economic services to all those in need; and
- $90,000 to the Council on American-Islamic Relations (CAIR) New York, a chapter of the national CAIR organization which is focused on protecting civil liberties, promoting justice, and enhancing the understanding of Islam among the broader public.

*See* Donation Proofs (Exhibit 1).

Over the past decade, Mr. Hassan has donated at least $2.17 million to charities and non-profit organizations.

Mr. Afaf Nasher, a community advocate for the end of religious-based hate discrimination in New York City, can speak to Mr. Hassan's unwavering support for all members of his community.

> Although I write this letter in my personal capacity, my interactions with Dr. Hassan came about due to my work as the Executive Director of a community-based nonprofit organization that assists people with hate crimes and discrimination. Dr. Hassan reached out to inquire about school safety measures after learning that some students were being harassed due to their faith and ethnicity as they entered and/or left the school building. The phone call evolved into a bigger conversation relating to the many manifestations of bigotry our community faces, and, more importantly, the work we all need to do to deter such bigotry. Dr. Hasan listened intently, and then took me by surprise when he asked, "What do we need to help fight this problem?" It was a simple question, but in the many years of doing this work, never have I seen someone so ready to help after a single phone conversation. I replied that we need legal assistance. Dr Hassan probed further with a second direct question that surprised me yet again: *"How much do you need to hire an attorney?"* The words practically stumbled from my mouth as I replied with an estimated salary for a starting attorney. Dr. Hassan offered to contribute the salary amount in installments over time.
>
> […]

I am certain Dr. Hassan's absence from the community will cripple the societal benefits he renders routinely for others. I believe he is someone who genuinely cares, through word and deed, about the tribulations of people known and unknown to him.

Mr. Afaf Nasher, CAIR New York, Support Letter (Exhibit 2).

> **a. Mr. Hassan's philanthropy extends far beyond financial support, encompassing years of service, labor, and care and an unwavering commitment to leading others through darkness, even when doing so requires extraordinary personal effort**

All the evidence given to the Court, not just the letters submitted on Mr. Hassan's behalf but also objective facts of record, establishes that, beyond a doubt, Mr. Hassan has devoted an extraordinary amount of time and effort to a wide range of socially beneficial activities. These activities demonstrate Mr. Hassan's big heart and selfless service to many, which he extended without self-promotion or fanfare. Still, Mr. Hassan's profound humility is well known in his community.

On behalf of the Bay Ridge Community Development Center, Inc., Ms. Bibi Esahack can attest that Mr. Hassan's continued volunteering and philanthropism to her organization has provided the local youth a positive example of what it means to be a community member and leader.

> I have known Mohamed for over twenty years, both in the capacity of a student and as a law-abiding community member. From the inception of our community center, Mohamed and his family have been generous benefactors. But the relationship goes further. *Mohamed volunteers at our food pantry*, feeding thousands of New Yorkers monthly, as well as participating in our youth leadership program. The young men who frequent our center look at Mohamed as a role model and they go to him for advice, both academically and professionally. *Mohamed has spoken on many occasions at our youth forums about a variety of issues* that affect young people today. He has also come by just hanging out with them, listening to their problems, and even playing a game of basketball. Those moments spent with us at the community center make him an invaluable asset.
>
> Mohamed's reputation among our community is above bar. Not only is he well liked, respected and revered, he is the epitome of thoughtfulness for the well-being of others. Whenever we need Mohamed, he has been there; no questions asked. His selfless volunteerism and philanthropy are unparalleled. *Mohamed's success as a businessman has had a ripple effect on our community.* He willingly gives back to the community to pay forward the love

and support his community has always shown him.

Ms. Bibi Esahack on behalf of the Bay Ridge Community Development Center, Inc. Support Letter (Exhibit 3).

Mr. Mustafa Abdalreheem, Chairman of the Muslim Community Center of Staten Island, writes on behalf of his organization to voice their overwhelming support for Mr. Hassan, the pillar of their community.

> Dr. Hassan was one of the most important figures in establishing our mosque. From the earliest stages, he encouraged, motivated, and supported is at every step as we worked to secure a permanent location. His unwavering commitment and generosity were instrumental in allowing is to purchase our building and finally open our doors. Without his guidance and support, our mosque—which now welcomes 500 people for Friday prayers—would never have come to fruition.

> From its inception, Dr. Hassan's vision centered on community service, strong youth and children's programs, and creating a safe and welcoming environment for women to worship. Today, the vision is realized through the many services our center offers. We run a weekly food pantry that serves our neighbors in need, a weekend school for youth, and a variety of educational and recreational programs for children each week. These programs have changed lives, and it is no exaggeration to say that Dr. Hassan's early support made them possible.

Mr. Mustafa Abdalreheem on behalf of the Muslim Community Center of Staten Island Support Letter (Exhibit 27).

Mr. Mohamed Badawy, Religious Director at the Muslim American Society Youth Center in South Brooklyn, expresses his thanks for Mr. Hassan's philanthropic work within his organization.

> [The Muslim American Society Youth Center] is the first Muslim youth center in the country and the only in NYC. It serves hundreds of youth weekly with a variety of services that are often underfunded and underdeveloped. Mohamed has always been the top supporter of all our work. From his generous donations to actually providing help with logistics and organization on the ground. *Whether it is the catering for an event or a widow with needy orphans*, I always know I can call Mohamed for either an immediate donation or guidance on how to achieve the most efficient and satisfactory goal. This philanthropy extends to any and all other community centers all over NYC that Mohamed

frequents. *He has helped me set up and promote youth programs for spiritual enlightenment, career fairs for high school students, anti-bullying and anti-drug programs at our alma mater*, and countless other endeavors. I shudder to think at the irreplaceable personal and community loss that his incarceration would incur.

Mr. Mohamed Badawy Support Letter (Exhibit 4).

Mr. Nagi Alsubai, Founder of Peer Minds, a nonprofit focused on advocating for youth mental health access in New York City's Middle Eastern, North African, and South Asian communities, has known Mr. Hassan for four years and describes his unparalleled commitment to service and uplifting others.

From the moment I met Dr. Hassan, his generosity and compassion were unmistakable. During the years I spent working with a humanitarian organization serving vulnerable families across the Middle East and South Asia, Dr. Hassan consistently donated to help provide food, shelter, and critical aid to men, women, and children affected by famine, war, poverty, and medical crises. He never once asked for recognition. He gave because he genuinely cares about human beings—even those he will never meet. His support helped thousands of people during some of the most devastating chapters of their lives.

*On a personal level, Dr. Hassan has profoundly shaped my own work in mental health advocacy*. When I first founded my nonprofit, Peer Minds, I was still in the earliest stages of building community support. He believed in my mission so deeply that he connected me with other passionate individuals—including a community leader named Abir Saleh—whose support has now become central to our women's wellness mental health program. Without his introduction, I truly would not have been able to reach the hundreds of young people across New York City who now receive culturally tailored mental-health support through our programs. His impact on my life and the lives of others has been real, tangible, and lasting.

Mr. Nagi Alsubai Support Letter (Exhibit 5).

Mr. Maged Amin, writing on behalf of New Egypt Group Inc., a 501(c)(3) nonprofit organization dedicated to humanitarian relief and community service, has had the privilege of witnessing Mr. Hassan's character, generosity, and compassion firsthand.

Throughout the years, Dr. Mohamed has been one of the strongest supporters of our nonprofit organization. Whenever we bring a case to his attention—whether it involves a family in crisis, a patient fighting cancer, or a person facing severe hardship—he responds

immediately and without hesitation. His support is not symbolic; it is real, direct, and often lifesaving. *I have personally seen Dr. Mohamed help cancer patients with treatment costs*, assist families who had nowhere else to turn, and provide emergency support in moments when time was critical. His kindness has restored hope to countless individuals who were suffering or at risk of losing everything. His actions have saved lives. Every year during the holy month of Ramadan, Dr. Mohamed works tirelessly to ensure that thousands of families receive food, meals, and essential support. This is a massive humanitarian effort that reflects both his deep faith and his commitment to serving the community. He does this quietly, humbly, and from the heart—never seeking recognition or praise.

Mr. Maged Amin writing on behalf of New Egypt Group Inc. Support Letter (Exhibit 6).

Ms. Donia Karem, the Executive Director of Muslims Giving Back, writes on behalf of her non-profit that seeks to empower marginalized groups within the New York Muslim community. Because of Mr. Hassan's commitment to her cause, Ms. Karem has been able to advocate for Islamic women and children in a way never before seen in New York City.

His generosity extended far beyond feeding the homeless. Dr. Hassan played an instrumental role in establishing Asiyah's Women Center, the first Muslim women's domestic violence shelter in New York City. When we needed a home to rent to provide safety for women and children escaping abuse, he stepped forward immediately and without hesitation. His support allowed us to open a refuge that continues to protect and empower survivors.

Dr. Hassan was also the first to support families in crisis—single mothers struggling to provide for their children, families on the verge of eviction, and individuals facing severe hardship. He never turned anyone away. He lived a humble and modest life, and even declined awards because he believed true charity should be done with sincerity and without public attention. His kindness and quiet generosity have touched thousands of lives across New York City.

Ms. Donia Karam on behalf of Muslims Giving Back Support Letter (Exhibit 28).

### b. In particular, Mr. Hassan gives back tremendously to the Al Noor School

The Al-Noor School is a co-ed private school in Greenwood Heights dedicated to uplifting Muslim youth in the broader Brooklyn community. Mr. Hassan proudly attended Al Noor from 1993 to 2003 and 2004 to 2008 and graduated with above-average grades. *See* PSR at ¶ 88. Mr. Hassan's two children now attend Al Noor. Because he was so moved by his experience at Al Noor as a student, Mr. Hassan has dedicated his adult life to not only supporting his children's schooling but also the education of every child that passes through Al Noor's doors. Indeed, Mr.

Hassan has no shortage of supporters that commend him for his prominent role in ensuring that every student gets the academic journey they deserve.

Mr. Ahmed Hussein, Mr. Hassan's childhood friend and brother-in-law, graduated from Al Noor likewise inspired to live a life in service to others. After serving as an officer in the New York Police Department, he currently holds positions in the New York Fire Department and the U.S. Army. Mr. Hussein doesn't offer his name, integrity, and good word lightly. It was his profound devotion to his long-time friend that moved Mr. Hussein to write a letter in support of Mr. Hassan.

> What pains me the most in this moment is that the man I know — the man my family knows — bears no resemblance to the person implied by the conviction he now faces. Mohamed has always been someone who acts with a sense of responsibility and a genuine desire to give more than he receives. Long before he was a successful businessman, when he had barely begun his career as a recent pharmacy graduate with little to his name, his first instinct was to give back to the school that raised him. He created an alumni program at Al Noor with the dream of helping the next generation discover their passions and their paths in life. He wanted students to see what was possible, to hear guidance from people in fields they aspired to join, and to understand that success is something that grows when shared. My sister and I joined him in that project, spending months planning events, speaking to students, and organizing opportunities for kids who often lacked access and direction. Mohamed never did it for recognition. He did it because he remembered what it meant to be young and uncertain, and he wanted to offer clarity and hope.

Mr. Ahmed Hussein Support Letter (Exhibit 7).

As an accountant at Al-Noor School, Mr. Nazih Kurdi has the privilege of interacting with many parents dedicated to providing the best education for their children. None have stood out more to Mr. Kurdi than Mr. Hassan, whose compassion extends far beyond the classroom.

> At Al-Noor school, I have also seen Mohamed help families many times. *Four years ago, a mother with three children was going through domestic violence. The father left, and she told us she would take the children out of school because she couldn't afford the tuition...He helped pay their tuition quietly, and he refused to let the family know it was him.* One of the children has already graduated and went to college because of his help. The other two are now in high school and doing well.

Mr. Nazih Kurdi Support Letter (Exhibit 8).

As a father who chose to send all his children to Al Noor, Mr. Atef Hussein, Mr. Hassan's father-in-law, has remained an active member of the Al Noor community. While writing his support letter for Mr. Hassan, Mr. Hussein remembered an example, one of many, of Mr. Hassan going out of his way to help a family in need. Ms. Rihab, a teacher from Al Noor, had a major house fire and her son was badly injured by the blaze. Mr. Hassan accompanied Ms. Rihab and her son to the hospital and paid for Ms. Rihab's accommodation at a nearby hotel so that she could remain close to her son as he recovered. Mr. Hussien remembers that Mr. Hassan supported Ms. Rihab "quietly, without telling anyone" in such a generous act of kindness that Mr. Hussein "will never forget." Mr. Atef Hussein Support Letter (Exhibit 9).

Mr. Eeman Abausi, an Al Noor Advanced Placement Psychology teacher and clinical psychology doctoral student, first met Mr. Hassan in high school. Mr. Abausi's relationship with Mr. Hassan has grown in the past five years through Mr. Hassan's participation in the parent teacher association. He says that he never ceases to be impressed by Mr. Hassan's continued humility and prioritization of student needs.

> To me, his humility stands out most. Even though he did a lot for the school, he never wanted recognition or titles. He did not want to be PTA president or be in the spotlight. He preferred to help quietly and avoided attention. A few years ago, I mentioned that our school needed a special education IESP [Individualized Educational Service Plan] coordinator. Students needed evaluations and families needed help, but we did not have the right support. *He did not know what an IESP coordinator was at first, but he saw the need and got involved. He worked with the board and school leaders until someone was hired. After COVID, when many students struggled with anxiety, we talked about starting a mental health awareness campaign. Mohammad quickly reached out to alumni and set up a mentorship group for students*. He also walked through the school regularly, asking students how they wanted to be supported.

Mr. Eeman Abuasi Support Letter (Exhibit 10).

Mr. Hassan's tireless dedication to the youth in his community resembles that of a father to his beloved children. As a fellow alumnus of Al Noor, Mr. Akram Gamil has been thankful to be Mr. Hassan's close friend since elementary school and now serves as a fireman engineer for the Department of Education and building manager at Al Noor. Mr. Gamil's daughter recently graduated from Al Noor in 2022 and found Mr. Hassan to be a guiding light during her strenuous senior year.

> In 2022 my daughter Nadia was in her last year of high school. Although, she tried her best volunteering after school she had low self esteem and zero confidence . She didn't even want to attend her own graduation . Mohamed noticed her efforts and made sure to recognize her on her High School Graduation.

He started a Student Giving Back Award for two of the graduates, which included an award and a contribution of $500 towards each students tuition. When my daughter heard her name announced by Mohamed while he was standing at the podium for the "Students Giving Back Award" she was stunned. She became very emotional to know that her efforts were noticed. Believe me when I say, my daughter watches that recording over and over again because it brings her joy. Mohamed helped build up her confidence and self esteem. She is currently in her fourth year of college . My son is studying Pharmacy and is in his third year in college. I can't express enough how much Mohamed has touched and motivated several lives. He is well known in the community, highly respected and loved by all!

Mr. Akram Gamil Support Letter (Exhibit 11).

The Court can see that Mr. Hassan has a prior history of extraordinary devotion, not only to community organizations, but also to many individuals in their time of need. The Guidelines disregard this measure of a man. Instead, Section 3553(a) requires the Court to take into account a defendant's character before imposing a sentence. *See* 18 U.S.C. § 3553(a).

> **B. Under Section 3553(A)(2) Time Served Sufficiently 1) Reflects The Seriousness Of The Offenses, Promotes Respect For The Law, And Provides Just Punishment For The Offense;[3] 2) Mr. Hassan Maintains His Innocence In The Immediate Matter And Will Not Commit Any Crimes, And Thus There Is No Concern About Protecting The Public From Future Crimes**

> **1. Mr. Hassan has been consistently employed**

Mr. Hassan's consistent employment described further below serves as a testament to his caring nature. Since Mr. Hassan's first job at the age of 14, scraping gum off the floor and carrying boxes around a local South Brooklyn pharmacy, he has been consistently employed.

From 2010 to 2015, Mr. Hassan attended Long Island University and earned his Doctorate in Pharmaceuticals. *See* PSR at ¶ 88. While still in school, Mr. Hassan started his first pharmacy internship at Rite Aid Pharmacy Corporation in Spring 2012, with a starting salary of $13 an hour, where he worked until his graduation in Summer 2015. *See* id. at ¶ 102. Meanwhile, between the summer of 2010 to his graduation in 2015, Mr. Hassan also worked minimum wage as a delivery driver, cashier, and register clerk for Wyckoff Corner Pharmacy in Brooklyn. *See* id.

From June 2017 to the spring of 2018, Mr. Hassan was employed as a supervising pharmacist at Nile RX Pharmacy, where he worked 40 to 50 hours a week verifying all incoming

---

[3] To be sure, a sentence of time served on its face wouldn't necessarily provide general deterrence. Here, however, such a sentence would inform the public that Mr. Hassan isn't similarly situated to anyone else. In other words, Mr. Hassan's extraordinary characteristics, unlike any other defendant in this courthouse or other ones, warrant such a variance.

prescriptions, overseeing his team of staff, and interacting with physicians regarding patient health. *See* id. at ¶¶ 100, 101. During an undisclosed period, Mr. Hassan also served as a supervising pharmacist at Raees Pharmacy. *See* id. at ¶ 102.

Since 2018, Mr. Hassan has displayed his entrepreneurship prowess as a pharmacy owner, real estate manager, and investor in ten pharmacies throughout Brooklyn, Staten Island, and Queens. *See* id. at ¶ 92. During his career as a pharmacy owner, Mr. Hassan has employed over 200 individuals.

For the past twenty-one years, Mr. Hassan has been an incredibly productive member of society. Any sentence greater than necessary—indeed, any sentence beyond time served—will prevent him from making further positive contributions to society.

## 2. Mr. Hassan's leadership as a small business owner has improved the local economies of Brooklyn, Staten Island, and Queens

Mr. Hassan's work ethic has long impressed those around him. Ms. Shifa Fozi describes how Mr. Hassan assisted in setting up her pharmacy despite it being a direct competitor to his own. *See* Ms. Shifa Fozi Support Letter (Exhibit 12). She deeply respects how Mr. Hassan has used his personal business successes to contribute to the careers of others.

> [H]e wants to give every single person a chance at earning a living. He has helped so many community members find jobs for their kids, their cousins, people moving here for the first time and barely speaking a lick of [E]nglish. Most people like him, people who have spent years and countless hours building their business, would be so picky about who they help but not with Mohamed. I remember when I first started working I would see messages from him at 4:30 am about ideas for my store or som[e]thing he thought I could work on. I used to think to myself, wow does this man sleep? He built his entire empire by true hard work and dedication and no one can deny that. The best part is that he was always willing to help anyone that asked.

Id.

Mr. Osama Al Saybi describes how Mr. Hassan was instrumental in helping Mr. Al Saybi launch his small business, OneDream, which he describes as a place for "kids to participate in [soccer] without being judged."

> He gave me advice about pursuing coaching fully and then when opening a small business for soccer gear, he was one of the first to attend our modest grand opening. He showed me support and lead by example. I look up to him and his courage and perseverance. I respect the way he handles himself and makes himself available to help in any way possible. He generously brought drinks, snacks or

water to our OneDream practice sessions and participated in the exercises alongside his kids. When he wasn't practicing with them, he was always close by, on the sidelines cheering and ready to receive his kids for hugs and high fives!

Mr. Osama Al Saybi Support Letter (Exhibit 13).

### 3. Mr. Hassan uses his pharmaceutical background, along with his natural compassion, to help many

Mr. Hassan's lifelong commitment to service is rooted in his pharmaceutical training and natural compassion, which has equipped him with a rare ability to recognize suffering, intervene with care, and guide those around him toward stability and healing.

#### a. Mr. Hassan's pharmaceutical background and natural compassion are informed by his witnessing of drug abuse within his family and broader community

Mr. Hassan witnessed his younger brother, Mr. Yasser Hassan, struggle with stimulant misuse, his paternal aunt overdose on prescription medication when he was still a teenager, and his uncle's dependence on Tramadol before treatment. *See* PSR at ¶ 72. He continues to grapple with the reality of his father's misuse of narcotic and non-narcotic pain relievers. *See* id.

Mr. Hassan's father, Mr. Alaa Hassan, saw firsthand how Mr. Hassan helped guide his younger brother out of addiction.

> …Yasser fell into substance abuse and gaming addiction. Mohamed and his wife took him to therapy, to psychiatrist, to psychologist. Many days Yasser left the house for days and we did not know where he was. Mohamed went out, called everyone, drove everywhere, and brought him home safe.
>
> One day Mohamed took him to rehab. After that Yasser got better. He went back to work. He got married Today he goes to the gym, he works, and he supports his home. All of this because of Mohamed. I always say I raised a real man.

Mr. Alaa Hassan Support Letter (Exhibit 14).

While Mr. Hassan's brother today struggles with severe depression and ADHD, Mr. Hassan is glad to describe his younger brother as his "first son." *See* PSR at ¶ 69. Indeed, rather than distancing himself from these painful realities, Mr. Hassan uses them as motivation to counsel, educate, and support those confronting similar battles.

His friend, Mr. Mohammad Badawy, the religious director of the Muslim American Society Youth Center and a recovering addict, describes Mr. Hassan as a "crucial figure" in his

14

life for over twenty-five years. Mr. Badawy says Mr. Hassan is someone whose guidance, integrity, and persistence were instrumental in his recovery and later success as a community leader. Mr. Badawy recounts how, as he descended from marijuana to opioid addiction, Mr. Hassan walked with him through freezing Bay Ridge nights, continued to stand by him when others gave up, connected him with treatment resources, and stood firm in rejecting the drug culture that surrounded their peers. Mr. Badawy writes the following to express his deep gratitude to Mr. Hassan.

> I will never forget Mohamed's persistence in following up with me, walking the freezing streets of Bay Ridge late at night to help me clear my head, trying to connect me with any resources he had to see the specialists I needed. It was a level of concern and determination to provide aid that surprised me but would be the hallmark of our relationship for many years.

Mr. Mohamed Badawy Support Letter (Exhibit 4).

Mr. Badawy's letter encapsulates Mr. Hassan's unwavering commitment to leading others through darkness, even when doing so required extraordinary personal effort. Far from a casual friend, Mr. Hassan became a lifeline. He became an unwavering presence whose care, generosity, and moral clarity helped pull a young man away from addiction and positioned him to serve the youth of South Brooklyn today.

### b. Mr. Hassan's witnessing of drug abuse encouraged him to lead his pharmacies through compassion

Mr. Hassan's experiences witnessing drug abuse encouraged him to lead his pharmacies through compassion. Having witnessed the devastating impact of untreated pain, addiction, and neglect within his own family, Mr. Hassan resolved to ensure that no patient under his care would feel abandoned, overlooked, or dismissed. That resolve became the foundation of his pharmacies' success, as patients recognized that his pharmaceutical training was matched if not exceeded by his humanity. His support letters describe a pharmacist whose instinct to help others consistently exceeds what is expected or required.

As someone who has been close friends with Mr. Hassan since pre-kindergarten, Ms. Walla Hassan is confident embodies the strong sense of community that is a core social value of Islam. In 2020, when Ms. Hassan moved short-term to Dubai, her father unexpectedly died from Covid-19, and she was unable to attend his funeral. Without being asked, and despite the fear surrounding the pandemic, Mr. Hassan reached out to Ms. Hassan's family to personally deliver food and help make arrangements during their grief-stricken time. One year later, Ms. Hassan gave birth to her special-needs daughter, and Mr. Hassan became instrumental in ensuring her good health.

> Mohamed will come to my assistance again when my daughter, born abroad a year later, was diagnosed with a serious, rare genetic condition. Her illness required that she be placed on a strict diet, where she can only consume low protein formula. The UAE is

15

limited when it comes to specialty medicine, so I was stressed with figuring out how to secure a supply of this life saving nutritional supplement post-Covid. After hearing about her case from the community, Mohamed volunteered to send me a large shipment of low protein formula, free of charge, until I was able return home to the U.S.

A year and a half later I had to travel abroad again to seek therapeutic services for my infant after she received a liver transplant in the U.S. However, I needed to ensure she can still access her daily medications. I was having difficulty coordinating these details with my daughter's routine pharmacy and that's when I contacted Mohamed for help. He then reached out to his fellow peers and explained the situation at hand to ensure that they properly contact insurance to get an advance on her medications.

Ms. Walla Hassan Support Letter (Exhibit 29).

Mr. Nazih Kurdi, a patient at one of Mr. Hassan's pharmacies, describes how he was suffering from incapacitating sciatica and called the pharmacy in tears just before closing time. Instead of turning Mr. Kurdi away, "[Mr. Hassan] drove to my home, came upstairs, and gave me the medicine himself." Mr. Kurdi said that Mr. Hassan even arranged for an employee to administer his injections when he could not. *See* Mr. Nazih Kurdi Support Letter (Exhibit 8).

Mr. Karim Azzat, another patient, shares a similar story.

[M]y wife traveled to Brooklyn to pick up her medication from the pharmacy. Mohamed did not know she was seven months pregnant at the time. When she arrived, he immediately offered her water and a snack, concerned for her comfort. After she left, he reached out to me personally—upset that she had made the trip at all. He told me clearly that had he known she was the one coming, he would have driven to Staten Island himself to deliver the medication.

Mr. Karim Azzat Support Letter (Exhibit 15).

Mr. Mram Shalabi, a third patient, describes how Mr. Hassan arranged for Mr. Shalabi's father, who was recovering from a heart attack, to receive medication within thirty minutes, even while Mr. Hassan was out of state. *See* Mr. Mram Shalabi Support Letter (Exhibit 16).

Others recount similar stories: the customer for whom he offered free delivery across boroughs without hesitation; the autistic teenager he comforted, treated, and soothed; and the patient with Type 1 diabetes who felt treated "like family at a time when [he] needed it most." *See* Ms. Shorouk Hussein Support Letter (Exhibit 17); *see also* Mr. Nagi Alsubai Support Letter (Exhibit 5). These are not isolated acts but a pattern of unwavering care. Whether providing free delivery to elderly or gifting fruits to patients during Ramadan, Mr. Hassan has used his

pharmacies as instruments of dignity, compassion, and community uplift.  *See* Mr. Mram Shalabi Support Letter (Exhibit 16).

### c. Mr. Hassan's compassion as a pharmacy owner inspired others working in pharmacies to provide the best possible care to patients

Mr. Hassan's compassion as a pharmacy owner extends far beyond the patients he has served; he inspired others working in pharmacies to provide the best possible care to patients. Indeed, Mr. Hassan has quietly shaped the professional lives of an entire generation of pharmacists who credit him with transforming their understanding of what community-centered pharmaceutical care should look like.  Many describe him not merely as a mentor, but as the catalyst who pushed them toward leadership roles they never believed themselves capable of.

One such example is Ms. Shifa Fozi, who graduated in 2020 during the uncertainty of the Covid-19 lockdowns.  She recalls expecting a conventional career behind the counter—"a mundane lifestyle," in her words—until Mr. Hassan recognized potential in her that even she could not see.  Ms. Shifa Fozi Support Letter (Exhibit 12).  He urged her to consider ownership, guided her through the daunting process of purchasing a pharmacy, and supported her as she established her own business in Bay Ridge in 2021.  *See* id.  Far from viewing her as a competitor, Mr. Hassan embraced her success as an extension of his mission to elevate patient care.  *See* id.  She describes calling him in tears, overwhelmed by staffing, paperwork, and the burdens of ownership, only for him to respond each time by asking, "How can I support you?" *See* id.  Five years later, her pharmacy is thriving.  "I stuck it out because of Mohamed," she writes.  *See* id.  Her success is a testament to Mr. Hassan's unique ability to empower others through both tough encouragement and unwavering belief.

Others echo similar experiences.  Mr. Saad Fozi explains that observing Mr. Hassan at work revealed a leader defined by "commitment to proper procedure and compliance," someone who built trusted internal protocols and held himself and others to the highest standards.  Mr. Saad Fozi Support Letter (Exhibit 18).  Under his guidance, Mr. Fozi revitalized his family's historic East New York pharmacy, an endeavor that deepened both their professional respect and personal bond.  *See* id.

Collectively, these accounts show that Mr. Hassan has not only served his community directly but multiplied his impact by inspiring pharmacists to lead with competence, integrity, and compassion.

### d. Mr. Hassan demonstrated particular compassion for his pharmacies' patients during the Covid-19 pandemic—including when he educated his community on the safety of the Covid-19 vaccine

Mr. Hassan's commitment to ethical practice and community wellbeing was especially evident during the most vulnerable period of recent history, the Covid-19 pandemic, when fear, confusion, and misinformation overwhelmed many in his community.

Mr. Nazih Kurdi, a patient at one of Mr. Hassan's pharmacies, describes how Mr. Hassan's

personalized care allowed him and his family to feel safe during unprecedented times.

> Mohamed is one of the most kind and caring people I have ever met. During COVID, when no pharmacy had the medicine for the virus, my brother and his whole family was sick. I called Mohamed for help. Even though his pharmacy is in Bay Ridge and my family lives in Bensonhurst, he got in his car and personally delivered the medicine to them. He stayed to explain how to use everything. At a time when everyone was afraid, Mohamed helped people without thinking twice.

Mr. Nazih Kurdi Support Letter (Exhibit 8).

Mr. Ayat Masoud, Esq., a practicing New York attorney who has known Mr. Hassan since 2017, recounts an experience that, in his words, "revealed [Mr. Hassan's] moral compass more clearly than anything else." Mr. Ayat Masoud, Esq. Support Letter (Exhibit 19). At the height of the pandemic, Mr. Masoud writes that he found himself overwhelmed by anxiety about the newly released vaccine. *See* id. He confided in Mr. Hassan, turning not to a lawyer or a friend, but to a pharmacist he trusted. *See* id. Mr. Masoud admitted that he was frightened to take the vaccine and even asked, in a moment of fear, whether Mr. Hassan would fill out a vaccination card despite Mr. Masoud not having taken the shot. *See* id. Mr. Hassan's response reflected a blend of compassion, clarity, and steadfast principles. He listened without judgment, reassured Mr. Masoud that the vaccine was safe, encouraged him to protect himself and his family by receiving it, and refused—without hesitation—to falsify any medical document under any circumstance. *See* id. His refusal was not harsh or moralizing; it was protective, rooted in his duty as a healthcare professional, and anchored in a sincere concern for Mr. Masoud's wellbeing. *See* id.

Mr. Masoud's account illustrates that, even amid unprecedented uncertainty, Mr. Hassan remained grounded in his responsibility to safeguard his community. His influence extended far beyond dispensing medication: he became a trusted mediator of medical information; a steady voice against misinformation; and an ethical anchor when others sought shortcuts out of fear. In a moment when many wavered, Mr. Hassan's integrity—and his instinct to guide others toward safe, lawful choices—remained unwavering.

**4. Mr. Hassan's impact on his community is demonstrated by the 177 support letters counsel received, 33 of which we have attached for the Court, including those from religious and community leaders, and New York City Council member for Bay Ridge Justin Brannan**

Mr. Hassan's family, friends, and colleagues have been highly supportive of him throughout his case. His impact on his community is more far-reaching than just the Egyptian, Arab, and Muslim groups in Brooklyn to whom he belongs. Mr. Hassan's impact on his community, along with his natural compassion, is demonstrated by the 177 support letters counsel received in preparation for the immediate sentencing memorandum. For the Court's ease, 33 are attached.

Mr. Mohammad Elshinawy, Religious Director of Jesus Son of Mary Mosque in Allentown, has known Mr. Hassan for most of his life and has been his primary religious consultant throughout the years.  Because of their relationship rooted in a profound dedication to God, Mr. Elshinawy has counseled Mr. Hassan throughout major life events and can attest to his wholehearted faith in not only God but also those around him.

> - I don't know anyone who has donated as much to good causes like emergency relief efforts, local feeding of the homeless, and building houses of worship, like him. Unlike others who may have tax benefits or prestige "top of mind" with similar acts of generosity, Mohamed would stipulate that I help him avoid insincerity by keeping his contributions anonymous, and despite that, has repeatedly told me that I must notify him if anyone has later donated more than him so he can try to further add to this anonymous donation.
>
> - Mohamed would, throughout the years, often randomly contact me asking if I knew of a family in need that he could bring relief to, as he was going through a rough patch and has always seen how secretly serving others has invited God's blessings into his life.
>
> […]
>
> - Despite being insanely busy…I vividly recall him accepting to serve on an advisory council of the Brooklyn Islamic Center (64st) immediately following an opioid related death of one of your youth. Shortly thereafter, he also joined the Al-Noor School board, also to ensure our youth are set up for success and being strategically steered away from the ills of wider society.

Mr. Mohammad Elshinawy Support Letter (Exhibit 20).

To his friends, Mr. Hassan is an inspiration for "all of us to take a more active role in our communities."  Saad Fozi Support Letter (Exhibit 18).  Ms. Shifa Fozi, a fellow community member and pharmacist, recalls a time when Mr. Hassan once reminded her of her own responsibility to give back to others.

> Whether the local mosque was asking for donations, or an organization was sponsoring orphans during hard times Mohamed was the first person to give back and then rally everyone we know to give back as well. Every single year his pharmacy has given away book bags and school supplies to the children in the neighborhood. Those parents will never forget that when it came time to send their kids to school they didn't need to worry about how to afford to send

> them off. There were times when I wasn't making any profit and barely paying myself my salary and I would opt out of contributing a donation. Mohamed would always reach out to me separately and tell me that any amount is better than nothing, and one day my business will make back anything I ever donate. My opinion of him has not changed despite his recent conviction simply because his actions amongst his peers have not changed either. I have always known him to be honest and thoughtful.

Ms. Shifa Fozi Support Letter (Exhibit 12).

Mr. Adam Fakir, a friend of Mr. Hassan's since the first grade, cannot fully express how thankful he is for Mr. Hassan's continuous support during times of great emotional and physical distress. After graduating college and moving to Chicago in 2018, Mr. Fakir's mother was diagnosed with cancer and his own health started rapidly deteriorating. During this heart wrenching period, Mr. Hassan financially supported Mr. Fakir and connected him to a doctor that eventually diagnosed him with Hashimoto's (autoimmune) disease. When it became clear that remaining alone in Chicago was detrimental to Mr. Fakir's physical and emotional health, Mr. Hassan, without hesitation, arranged for Mr. Fakir's return to his family in New York. To this day, Mr. Fakir believes that, without Mr. Hassan's "love, clarity, and action," he wouldn't be here today. *See* Mr. Adam Fakir Support Letter (Exhibit 21).

Mr. Fakir goes on to reveal the impact that Mr. Hassan has on those around him and can provide countless examples of how Mr. Hassan's generosity extends even to those he knew less well.

> One afternoon, while at Pizza Hut, a group of hungry children approached the door and the staff tried to push them away. Before any of us could react, Moe stood up gently and asked the workers to let the children inside. He told the kids they could order whatever they wanted. Watching them feel seen and joyful, even just for a moment, showed us again the quiet truth of who Moe is. That was not charity — it was compassion in its purest form.
>
> […]
>
> It is difficult to summarize nearly thirty years of a bond built not just on shared memories but on shared growth and shared love. Our friendships are not transactional — they are connections of the heart. Moe has always been a pillar among us. If he were suddenly absent from my life, there would be a real void — a dimming of light.

Id.

Mr. Hassan readily supported others with time, counsel, and spiritual and emotional assistance, as well as financial support. Mr. Shawkat Said is a delivery man at one of the

pharmacies owned by Mr. Hassan.  Mr. Said is grateful for Mr. Hassan's donation, which allowed him to perform *Umrah*, a pilgrimage to Mecca with deep spiritual significance for those of the Islamic faith.  *See* Mr. Shawkat Said Support Letter (Exhibit 22).  Mr. Hassan also supported Mr. Said's friend as he navigated his daughter's divorce.

> One moment I will never forget is when my daughter was going through a very difficult divorce. The legal process was a heavy burden on our family, emotionally and financially. *Mohamed stepped forward and supported us financially, emotionally, and without hesitation, covering significant legal fees during a time when we felt overwhelmed and alone*. His support brought stability and comfort to my family, and it is something I will be grateful for the rest of my life. His actions during that time reflected compassion, sincerity, and genuine humanity.

Id.

Mr. Karim Azzat is the founder, religious director, and imam at the Islamic Center of Staten Island.  *See* Mr. Karim Azzat Support Letter (Exhibit 15).  Unsurprisingly, one of Mr. Azzat's earliest experiences with Mr. Hassan was one of great generosity.  Upon learning that Mr. Azzat would be leading a 100-person group to perform the *Hajj*, the major pilgrimage to Mecca and one of the most important events in Muslim life, Mr. Hassan donated hygiene kits and other essentials for the entire group to feel more prepared for their pilgrimage.  Id.  Seven other imams write to the Court to support Mr. Hassan.  *See* Imam Support Letters (Exhibit 23).  Undeniably, Mr. Hassan's thoughtful gestures reflect his immense care for others.

Mr. Hassan's generosity extends beyond his Muslim community.  Mr. John Caportorto, a pharmacist and Mr. Hassan's mentor, describes how Mr. Hassan helped a Catholic parish recover after tragedy.

> One moment in particular will stay with me the rest of my life. On Holy Saturday of this year our church Saint Edmund of Breezy Point burnt down, a church of different faith than his. He immediately organized efforts to help. He got donations from his Pharmacists and from his workers,himself and from anyone who could donate. He did this, not for himself nor because he was asked, but because he felt it was the right thing to do. This touched me in a way words cannot express.

Mr. John Caportorto Support Letter (Exhibit 24).

Mr. Ahmed Hussein, Mr. Hassan's brother-in-law, a FDNY firefighter and former NYPD police officer, recounts how Mr. Hassan sent goods to U.S. troops overseas to boost comfort and morale throughout Mr. Hussein's deployment as a U.S. Army staff sergeant and combat engineer.

> Throughout my military service, Mohamed has never failed to check

> on me. When I was deployed overseas, living in an outpost in the desert with limited access to basic necessities, he would call to ask if I needed anything. *When I mentioned something as simple as protein bars for myself and my troops, he didn't just send a few; he sent boxes filled with every brand and flavor he could find.* It may sound small, but in an environment where morale is fragile and comforts are scarce, gestures like that reach the heart in ways that linger for a lifetime. I saw firsthand how much it meant to my soldiers to be remembered by someone they didn't even know — simply because Mohamed cared.

Mr. Ahmed Hussein Support Letter (Exhibit 7).

Mr. Hassan's contributions to Brooklyn and the broader communities to which he belongs have been so substantial that they drew the attention of New York City Council Member Justin Brannan, who writes to the Court in recognition of Mr. Hassan's impact. *See* New York City Council Member Justin Brannan Support Letter (Exhibit 25). It is telling that an elected official, who interacts daily with community needs and the individuals who fulfill them, describes Mr. Hassan as a force for good whose absence would be deeply felt.

As is plain, Mr. Hassan has no shortage of family, friends, and community members who would be deeply affected by his absence.

### 5. Mr. Hassan is the bedrock of his family

Mr. Hassan is, above all else, the bedrock upon which his family stands. Those closest to him describe a man whose identity is inseparable from his devotion to his parents, siblings, wife, children, and extended family. His commitment is expressed not only in words, but in years of quiet, consistent, self-sacrificial action.

#### a. Mr. Hassan is a loving father to two young children, Emma and Faris, aged 5 and 7

Though Mr. Hassan recalled a "bumpy" relationship with his father in his youth, he said that he understands their early relationship was shaped by cultural expectations and the challenges of raising children in a new country. PSR at ¶ 68. Mr. Hassan explained that becoming a father illuminated the fears and intentions that had caused his father's strictness. Mr. Hassan's father tells the Court himself that Mr. Hassan has learned to demonstrate his love to his children more freely than he did.

> Until now Mohamed wakes up at 5 am. He reads. He prays. He takes his kids to school. He goes to their activities. He runs after his kids in my house and hugs them so much. I was not like that with my kids. Mohamed always tells me he takes the good from me and makes it better. The way he is with his family, I never saw a father like this. His kids love them so much they run to him when they see

him. In the car he plays their songs and they sing. Even when he has a migraine he says it is not their fault.

Mr. Alaa Hassan Support Letter (Exhibit 14).

Mr. Hassan's wife, Ms. Shorouk Hussein, states plainly that he is "Emma's everything" and a "role model to Faris," and that the children would suffer profound emotional harm if deprived of their father's presence. *See* PSR at ¶ 74.

Their marriage, too, is described as exceptionally close. Ms. Hussein recounts that they are "friends before anything," and that her husband embodies the roles of provider, protector, and moral anchor with unwavering sincerity. Id. at ¶ 77. She explains that the immediate matter "stripped [their lives] to the core." Id. at ¶ 78. Despite waking each day "shattered," Mr. Hassan shields the children from adult fear, maintaining their routines and emotional stability. Id.

Those who interact with the family daily echo Ms. Hussein's observations. Mr. Ahmed Hussein, the firefighter, and U.S. Army sergeant, who has known Mr. Hassan since childhood and later became his brother-in-law, describes watching him grow "day by day, year by year," from a hardworking young man into a committed husband and father. Mr. Ahmed Hussein Support Letter (Exhibit 7).

> Over the years, I have watched him grow from a young man filled with ambition and humility into a father, husband, and community leader whose influence touches countless lives. I do not speak of him from a distance — I speak as someone who has seen the fullness of who he is, day by day, year by year.

Id.

Others describe Mr. Hassan as the parent who is always present—kneeling to speak to his daughter at eye level, cheering for his son at soccer, gently guiding them through the complexities of early childhood, and greeting them each day with attention and warmth. *See* Mr. Osama Al Sahybi Support Letter (Exhibit 13); *see also* Mr. Atef Hussein Support Letter (Exhibit 9); *see also* Ms. Hanan Hassan Support Letter (Exhibit 26).

He guides his children every step of the way by teaching responsibility (such as requiring then-six-year-old Faris to pay from his allowance for a broken school light), modeling kindness (helping Emma craft an apology card when she hurt another child), and prioritizing their milestones even amid personal crisis. The week after Mr. Hassan's guilty verdict, he pushed aside his pain to celebrate Faris's seventh birthday "because that is what his son wanted." *See* Ms. Shorouk Hussein Support Letter (Exhibit 17).

At night, he maintains a cherished ritual with his children called "special time," preserved without interruption for three years. *See* id. The children beg him to stay longer. *See* id. These moments reflect a father whose presence is irreplaceable. Removing him would not merely disrupt their lives but fracture the emotional structure around which the children have been raised.

### b. Mr. Hassan is the sole, dutiful caregiver to his parents—especially his 63-year-old father who suffers from deteriorating health conditions

Mr. Hassan speaks to his parents every day and has assumed full responsibility for their wellbeing "financially, emotionally, and physically." *See* PSR at ¶ 68. When his father's health began to "deteriorat[e]" in 2018, Mr. Hassan responded not with distance but with deep gratitude. He purchased a home for his parents, paid off their debts, and insisted that they no longer shoulder the burden of financial worry. *See* id. His wife corroborated that he is, in every meaningful sense, his parents' sole caretaker. *See* id.

Mr. Hassan personally accompanies his father to every doctor's appointment, MRI screening, and treatment. *See* Ms. Shorouk Hussein Support Letter (Exhibit 17). He takes his mother out for coffee simply to "check in on her heart and make her feel loved." Id. These are not occasional acts of care but weekly, often daily, responsibilities that no one else in the family can realistically assume.

Although Mr. Hassan's father's poor health prevents him from handwriting or typing a letter to the Court, he dictated the following to make his feelings known to the Court.

> Judge, I am very sick. I have heart problems. I have sciatica. I have very bad back problems. I cannot survive without Mohamed. When my back hurts Mohamed gives me a bath. He cuts my nails because my hands shake. After my surgery two years ago he took me to the bathroom. If he is taken away from us, I will not make it. My wife will fall into depression. His beautiful happy children will not be the same again.

Mr. Alaa Hassan Support Letter (Exhibit 14).

Mr. Atef Hussein, Mr. Hassan's father-in-law, describes how Mr. Hassan approached Ms. Shorouk Hussein's family with deep respect and sincerity in anticipation of their engagement, honoring every cultural expectation. Before granting his approval, Mr. Hussein conducted his own inquiries, speaking to teachers, friends, and the imam, each of whom affirmed Mr. Hassan's integrity. "Everyone told me the same thing: Mohamed was known as a respectful, reliable, and hardworking young man; someone people trusted. Not a single person had a bad word to say about him." Mr. Atef Hussein Support Letter (Exhibit 9).

Shortly thereafter, Mr. Atef Hussein suffered a medical emergency, and Mr. Hassan's response revealed the depth of his character: "I became very sick… Mohamed came right away. He stayed with me the entire night, even sleeping on the floor of the hospital room just to make sure I was not alone. Some might say a young man does this to impress a future father-in-law, but time showed me that this is simply who he is. Even when there is nothing to gain, he shows up." Id.

Taken together, these accounts present an unmistakable picture of a man dedicated to his

wife, children, family, and community. Long before this case—long before marriage, fatherhood, or professional success—Mr. Hassan was known throughout his community as a young man of integrity, humility, and unwavering consideration for others. These qualities have only deepened with time, and they form the backbone of the man before the Court today.

6. **Mr. Hassan is committed to continuing his life of honest and industrious work**

The immediate matter has transformed Mr. Hassan's life. For the past nineteenth months, those close to Mr. Hassan notice that he has been trying to hide the emotional toll that the immediate matter has taken on him, so he can be the dutiful father his children deserve him to be. His mother, Ms. Hanan Hassan, can recount many times that her daughter-in-law called her because Mr. Hassan "broke down crying" and he didn't want his children to see him upset. Hanan Hassan Support Letter (Exhibit 26). Even on nights he spent crying with his wife over their fear of the future, Mr. Hassan always made it a point to smile for his children. *See* Shorouk Hussein Support Letter (Exhibit 17).

Despite the pain and uncertain future Mr. Hassan faces, his friends have noticed that he has taken this opportunity to better connect to God, learn more about himself, and stay grounded in his faith. Mr. Adam Fakir, Mr. Hassan's lifelong friend, remembers that, when he was first informed of Mr. Hassan's conviction, "there was no defiance in his tone," just "sincerity, humility, and reflection." Mr. Adam Fakir Support Letter (Exhibit 21).

Looking ahead, Mr. Hassan has a clear and responsible plan for his future. He intends to remain a productive, contributing member of society by redirecting his work ethic and entrepreneurial drive into lawful and socially beneficial pursuits. In light of the circumstances of this case, Mr. Hassan has already begun the process of selling his pharmacies and transitioning out of the pharmaceutical field entirely.

With characteristic determination, he plans to build upon the real estate and construction ventures he has quietly developed over the past several years. These are pursuits that require no licensure restrictions and that allow him to support his family while contributing positively to his community. His goal is to grow this work into a stable, long-term career path that reflects both his skills and his desire to move forward responsibly.

Mr. Hassan hopes to address these plans to the Court in his personal statement as well, reaffirming his commitment to a lawful, productive future and to continuing to serve others through honest, industrious work.

C. **The U.S.S.G. Section 2D1.1(b)(1) Table Is An Improper Benchmark By Which To Fashion Mr. Hassan's Sentence**

"A criminal defendant has a due process right to be sentenced based on accurate information.... [W]here the district court sentences a defendant based on the drug-quantity guidelines, it must find the government's information sufficiently reliable to determine drug quantity by a preponderance of the evidence." United States v. Helding, 948 F.3d 864, 870 (7th

Cir. 2020)(citing United States v. Tucker, 404 S. Ct. 443, 447 (1972). A sentencing court acts within its discretion when it credits confidential informants' statements about drug quantity, but when a defendant objects, the evidence supporting that quantity must be found to be reliable." United States v. Rollerson, 7 F.4th 565, 570 (7th Cir. 2021)(citing United Helding, 948 F.3d at 866 (7th Cir. 2020)). The "threshold for a sufficient reliability finding" is "low." Helding at 871. But if the PSR "asserts 'nothing but a naked or unsupported charge,' the defendant's denial of that information suffices to cast doubt on its accuracy." Id. A truly bare allegation and bare denial would be in equipoise, unable to meet the prosecution's burden of proof by a preponderance of the evidence. Rollerson, 7 F.4th at 570. Once the prosecution presents sufficiently reliable evidence, however, it will meet its burden unless the defense can muster evidence in the other direction. Id.

While it is obligated to consider the Guidelines range, "a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." Id. United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008) (en banc) citing Kimbrough v. United States, 128 S.Ct. 574-75 (2007).

Thus, even if this Court agrees with a Section 2D1.1(c)(3) base offense level of 34—the same level applicable to street dealers found to have distributed 12 kilograms of the Schedule I fentanyl or 30 kg of Schedule I heroin—to have been properly computed, it can still find the use of the Section 2D1.1(c) table unjustified in atypical circumstances or the drug conversion table in Section 2D1.1 Application Note 8(D) to be so arbitrary and irrational as to constitute an unreliable benchmark by which to set the base offense level. Where, considered collectively, they constitute the primary constituents of a 324 to 405-month Guidelines range for a nonviolent first-time offender for whom there are no identifiable victims, the Court should so find the charts here. See PSR at ¶¶ 51, 60, 109.

Section 2D1.1(c) of the Federal Sentencing Guidelines provides the base offense levels for various quantities of specific controlled substances. Notably, given the extent of its abuse, oxycodone, a Schedule II controlled substance, is not among the many drugs listed in the Section 2D1.1(c) table. PSR at ¶ 33. Rather, Application Note 8(D) in the Commentary to Section 2D1.1 obligates the Court to consult so-called Drug Equivalency Tables typically employed to obtain a single offense level in offenses involving a number of different controlled substances. See PSR at ¶¶ 33, 51. Each drug is converted to its "marijuana equivalent," and the marijuana equivalencies are added to determine the combined marijuana equivalency. Pursuant to the table, 1 gram of Schedule I *heroin,* pure or mixture, equates to 1 kilogram of marijuana, 1 gram of Schedule I *fentanyl*, pure or mixture, equals 2.5 kilograms of marijuana and 1 gram of pure Schedule II oxycodone equals 6.7 kilograms of marijuana. § 2D1.1 Application Note 8(D). In other words, apparently on the theory that the former are not always seized in their pure undiluted state, Schedule II oxycodone is treated as 6.7 times as harshly as heroin and 2.68 times as harshly as lethal fentanyl.

That oxycodone ratio was promulgated in 2003, when the Sentencing Commission adopted Amendment 657. Previously, the Guidelines considered the entire weight of a pill or mixture containing oxycodone. Seeking to address proportionality issues that resulted in disparate treatment of similarly culpable offenders, the Amendment provided that only the amount of pure

oxycodone in a pill be counted.  That seemingly ameliorative approach was undone, however, when the "oxycodone" marijuana drug equivalency was changed from 1 gm of (mixture containing) Oxycodone = 500 gm of marijuana, half of the heroin conversion ratio, to 1 gm of (pure) Oxycodone = 6700 gm of marijuana," a 13,400 percent increase and almost three times harsher than fentanyl is treated.  See *Amendment 793*, available at https://www.ussc.gov/guidelines/amendment/657,  UNITED  STATES  SENTENCING COMMISSION, November 1, 2003 ("This equivalency keeps penalties for offenses involving 10 mg OxyContin pills identical to levels that existed prior to the amendment, *substantially increases penalties for all other doses of OxyContin*, and decreases somewhat the penalties for offenses involving Percocet." Emphasis added.).

There is <u>no</u> science underpinning the so-called marijuana equivalency ratios.  The Committee has never provided any mathematical formula for how it has determined the relative severity of different drugs.  Even allowing that the revised 1 to 6700 conversion ratio is based on the pure weight of the oxycodone at issue, there is no justification for treating Schedule II oxycodone as more than two and one half times as serious as what in many cases may well be pure fentanyl.

Spurred by the 2014 elevation of hydrocodone from Schedule III to Schedule II from in 2014, the Sentencing Commission enacted Amendment 793 to the Guidelines Manual in 2015.  It revised the Drug Conversion Tables to give hydrocodone the same marijuana equivalency ratio the Commission applied to oxycodone in 2003.  *See* Supp. to Guidelines App. C, Am. 793 (pp. 105–07).  Concerning its marijuana equivalency methodology, it explained that it considered: potency of the drug, medical use of the drug, and patterns of abuse and trafficking, such as prevalence of abuse, consequences of issue including death or serious bodily injury from use, and incidence of violence associated with its trafficking.  <u>Id</u>.  While useful, the Commission's disclosure of the variables it considers sheds little light on the relative weight it assigns each factor and explains not at all its conclusion that prescription oxycodone constitutes a far greater threat to the American public than fentanyl or heroin.  The Commission purports to consider the same factors on which the DEA fashioned its drug schedules, yet the Commission inexplicably treats oxycodone much more harshly than fentanyl and heroin.  *See Drug Scheduling*, available at https://www.dea.gov/drug-information/drug-scheduling,  UNITED  STATES  DRUG ENFORCEMENT ADMINISTRATION.

Fentanyl deaths increased every year from 2013 to 2022.  *See Are fentanyl overdose deaths rising in the US?*, available at https://usafacts.org/articles/are-fentanyl-overdose-deaths-rising-in-the-us/, USAFACTS, October 24, 2025.[4]  There were 3105 deaths in 2013 nationwide. <u>Id</u>.  By 2023, 72,776 suffered fatal fentanyl overdoses, almost 200 deaths per day.  <u>Id</u>. A quarter of a million Americans have died from fentanyl overdoses since 2021.  <u>Id</u>.  According to the CDC, the age-adjusted death rate for *all* synthetic opioids save methadone, of which fentanyl is by far the most abused, was 22.2 per 100,000, a decline from 22.7 in 2022.  In contrast, the age-adjusted death rate for *all* natural and semisynthetic opioids, of which oxycodone is one, was 2.9 per 100,000 down from 3.5 in 2022.  *Drug Overdose Deaths in the United States, 2003–2023*,

---

[4] USAFacts.org is a not-for-profit, nonpartisan civic initiative that collects and publishes government data to make it more accessible and understandable to the public.

available at https://www.cdc.gov/nchs/products/databriefs/db522.htm, NATIONAL CENTER FOR HEALTH STATISTICS, December 2024.  In other words, fentanyl abuse causes *ten times* as many deaths as *all* natural and semisynthetic opioids.  Yet, the conversion table treats oxycodone considerably harsher.

A tiny amount of fentanyl can prove fatal.  Any mistake in the concentration of a mixture sold illegally on the street can prove lethal.  According to the Department of Justice itself, a substantial percentage of fentanyl is distributed to opiate addicts in the form of counterfeit 30 milligram oxycodone pills. *See Dangerous fentanyl masked as counterfeit oxycodone, 20,000 pills seized in the Bronx and Manhattan*, available at https://www.dea.gov/press-releases/2019/02/11/dangerous-fentanyl-masked-counterfeit-oxycodone-20000-pills-seized-bronx, UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, February 11, 2019 ("counterfeit oxycodone pills containing fentanyl are increasingly appearing on the black market in NYC"); *see also HSI New York, Federal Partners Announce Charges Against 18 Defendants in Scheme to Manufacture, Distribute Millions of Deadly Counterfeit Pharmaceuticals Through Fake Online Pharmacies*, available at https://www.ice.gov/news/releases/hsi-new-york-federal-partners-announce-charges-against-18-defendants-scheme, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, October 1, 2024 (at least 9 victims died of narcotics poisoning after buying illicitly manufactured pills "shaped, dyed, and stamped to be indistinguishable from actual prescription medication).

Manufactured by different organizations, the amount of fentanyl in the fake pills can vary greatly.  While in no way intimating that the crimes of conviction constituted any sort of social benefit, it must be pointed out, solely for the purpose of permitting the Court to assess the lack of scientific validity of the conversion tables, that in the midst of a pandemic of opiate abuse, the availability of prescription pills in regulated doses in which addicted consumers can have confidence can and likely did actually save lives.[5]  In so saying, we are not denying that their widespread availability, in amounts so extraordinary that their legal manufacturers had to know they were being diverted for illicit use, was not a major cause of widespread addiction.

In short, a sentence of time served sufficiently reflects the seriousness of the offenses and promotes respect for the law.  Mr. Hassan maintains his innocence and will not commit any crimes, and thus there is no concern about protecting the public from future crimes.

## III.   PSR OBJECTIONS AND REQUEST FOR A *FATICO* HEARING

On December 7, 2025, the defense emailed Probation, with the government cc'd, Mr. Hassan's PSR objections.  On December 11, 2025, the defense filed Mr. Hassan's PSR objections with the Court.  *See* ECF No. 464.  As the government attests, the defense filed comprehensive objections to the PSR, which "require[d] twelve single-spaced pages to relay[] [and] are complex and voluminous."  ECF No. 463.  The government filed a response to Mr. Hassan's PSR objections earlier today.  *See* ECF No. 467.

Probation has yet to file a Final PSR.  The defense affirms Mr. Hassan's previous

---

[5] Validity is the degree to which a measurement, here, the conversion ratio, accurately measures what it is intended to measure, here the relative social harm of a particular abused drug.

objections.  The defense also requests a *Fatico* hearing on anything the government challenges regarding our PSR objections.

## IV.   REQUEST FOR A FORFEITURE HEARING

Probation <u>incorrectly</u> claims that "[t]he defendant agrees to forfeit all rights, title, and interest in all property, which are subject to forfeiture, as outlined in Part D of this report."  PSR at ¶ 6.  Mr. Hassan therefore requests a forfeiture hearing, as the government has yet to provide a forfeiture figure.

## CONCLUSION

For the foregoing reasons, the Court should sentence Mr. Hassan to time served.  Thank you.

Dated:  December 12, 2025
          New York, NY

Respectfully submitted,

Varghese & Associates, P.C.

<u>              /s/              </u>

By:    Vinoo P. Varghese
          Dennis J. Ring (*of counsel*)

*Counsel for Mr. Mohamed Hassan*