

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

FTB:LZ/VAZ/GMR/CSK
F. #2021R00592

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 16, 2025

<u>By ECF</u>

The Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

<div style="margin-left: 2em;">

Re: United States v. Mohamed Hassan
<u>Criminal Docket No. 22-464 (S-1) (AMD)</u>

</div>

Dear Judge Donnelly:

  The government respectfully submits this letter in advance of defendant Mohamed Hassan's sentencing hearing, which is scheduled for December 18, 2025. After a three-week trial, a jury found the defendant guilty of conspiracy to distribute oxycodone, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C); oxycodone distribution and dispensation, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); and conspiracy to dispense oxycodone, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). The defendant sold—and had pharmacists in his criminal pharmacy ring sell—high-strength, highly addictive oxycodone to street dealers for selling on the street based on invalid prescriptions from a corrupt medical office in Brooklyn, New York. The defendant joined the scheme not for any legitimate medical or professional purpose, but for the money.

  Thus, the government submits that a sentence within the defendant's range under the United States Sentencing Guidelines (the "Guidelines")—is necessary here to account for the defendant's destructive and wide-ranging conduct and to provide specific and general deterrence. The government also requests that the Court impose forfeiture of $1,100,791.87 and certain occupational restrictions during the defendant's term of supervised release, as set forth below.

I.   <u>Relevant Facts</u>

  A.   <u>The Opioid Epidemic</u>

  As explained at trial, oxycodone is a Schedule II opioid—that is, an addictive painkiller. Federal law "creates a comprehensive, closed regulatory regime" governing controlled substances, and the regime "places substances in one of five schedules based on their

potential for abuse or dependence"; their "accepted medical use"; and relative safety. Gonzalez v. Oregon, 546 U.S. 243, 250 (2006). Schedule II is the category for the "most addictive or dangerous" drugs that have a known legitimate medical use—the "really kind of strong drugs that you would get maybe after a big surgery or end-of-life care." (Tr. 925.) Oxycodone is in the same family as heroin and will produce a similarly "euphoric feel." (Tr. 926, 933-34; see also Tr. 1044 ("[Oxycodone]'s ability to addict somebody or to be abused is just below heroin.").)

Legitimately dispensed oxycodone is "only supposed to be prescribed for three to five days," and "if [a patient has] never been on an opioid before, [a doctor] needs to start with the lowest dose because that's how powerful it is." (Tr. 1061-62.) This case involved thousands of repeated 30-day supply prescriptions of oxycodone 30 mg. For benchmarking purposes, that combination of medication amount and strength is something a doctor might consider for cancer patients. Oxycodone 30 mg pills are "the standard dosage for individuals who abuse or are addicted to oxycodone, as it is the highest dosage that can be abused without having properties that make the pill difficult to crush for snorting purposes." (Presentence Investigation Report ("PSR"), ¶ 8.) As explained at trial, the 30 mg strength is "the most popular by demand on the street," and it "became very popular on the street because it is so strong." (Tr. 927; see also Tr. 1761 (defense expert acknowledging that oxycodone 30 mg is "prone to abuse").) Opioid abusers crush and snort or inject the 30 mg pills, giving the abusers "an instant hit of all of that medication." (Tr. 1065.)

The risk to human lives is clear. Someone "taking a high[-]dose opiate the very first time"—that is, an opioid naïve person—"could immediately stop breathing and overdose." (Tr. 1062; see also Tr. 1722, 1760 (defense expert acknowledging that oxycodone 30 mg "is not a typical starting dose," and that, in general, oxycodone 30 mg is typically prescribed in five- to 10-day supplies); Tr. 1762 (defense expert noting that oxycodone "could slow your breathing" because it is a "respiratory depressant").) Thus, the Food and Drug Administration considers oxycodone to be "significantly dangerous" and requires pharmacists to be educated on oxycodone "to make sure that if they're dispensing [it], those patients are aware of how potent and strong [it is] and how deadly [it] can become." (Tr. 1065.)

Indeed, from 1999 to 2020, 565,000 Americans died of opioid-involved overdoses. See Jonathan Duff et al., Cong. Rsch. Serv., IF12260, The Opioid Crisis in the United States: A Brief History (2022), https://crsreports.congress.gov/product/pdf/IF/IF12260. Since 2017, more than 130 people in the United States have died *every day* from overdose opioid deaths. See U.S. Dep't of Justice, Off. of the Inspector Gen., Review of the Drug Enforcement Administration's Regulatory and Enforcement Efforts to Control the Diversion of Opioids 1 (2019), https://www.govinfo.gov/content/pkg/GOVPUB-J37-PURL-gpo126560/pdf/GOVPUB-J37-PURL-gpo126560.pdf. And in 2009, nearly one-third of people aged 12 and over who abused drugs for the first time started with non-medical use of a prescription drug. See United States v. Lewis, 521 F. App'x 109, 111 (4th Cir. 2013).

The proliferation of pill mill clinics—such as Linden Medical (co-defendant Ratanaprasatporn's medical practice)—has significantly contributed to the opioid crisis. See U.S. Dep't of Justice at 3-4. Prescription drugs were the initial driver of the opioid crisis: nearly 80% of individuals who abuse illicit opioids first abused a prescription opioid. Id. at 2. Locally, the opioid crisis has continued to worsen, as deaths due to opioid overdoses generally have

increased over time in both New York State and New York City.  See Off. of N.Y.S. Comptroller, Off. of Budget Policy & Analysis, Continuing Crisis—Drug Overdose Deaths in New York 1 (2022), https://www.osc.ny.gov/files/reports/pdf/drug-overdose-deaths.pdf.  A fatal overdose occurs every four hours in New York City.  See N.Y.C. Off. of Special Narcotics Prosecutor, NYC Overdose Deaths, https://www.snpnyc.org/opioid-crisis/ (last visited Dec. 9, 2025).

The economic burden of the opioid crisis amounts to an estimated $78.5 billion every year.  See U.S. Dep't of Justice, supra, at 2.  This amount includes $28.9 billion in healthcare and substance-abuse treatment costs.  These staggering economic costs are overshadowed only by the devastating impact of opioid abuse on communities and families throughout the United States.  This was placed in stark relief during jury selection, as numerous jurors expressed to the Court the profound consequences that the opioid epidemic had had on their own lives.  See, e.g., Tr. 58 ("I had a niece and a nephew that are still hooked on to Oxy and one person that died from it."); 60 ("So I had a friend who overdosed on oxycodone not too long ago. . . . He passed away."); 60 ("So I have two cousins that currently are addicted to opioids"); 61 ("[M]y younger son, he just finished rehab over it, oxycodone").

B.    The Oxycodone Scheme

As described in the PSR and proven at trial, the defendant played a pivotal role in a pill-mill conspiracy involving the unlawful distribution and dispensation of the opioid oxycodone.  (PSR ¶¶ 14-24); see United States v. Capistrano, 74 F.4th 756, 765 n.1 (5th Cir. 2023) ("A 'pill mill' is a colloquial term for a medical clinic in which practitioners distribute controlled substances without 'medical necessity or therapeutic benefit.'"  (citation omitted)).  The defendant knowingly violated the narcotics laws and became, in effect, a drug dealer—despite his supportive and well-resourced background.  (See PSR ¶¶ 68-69, 77, 103.)  Because of his training as a pharmacist, the defendant had the immense privilege of serving as a gatekeeper—or, as one witness put it, the "last line of defense" (Tr. 1037)—between patients and addictive and dangerous drugs.  The defendant abused that privilege over and over again.

The oxycodone was prescribed under co-defendant Dr. Somsri Ratanaprasatporn's Drug Enforcement Administration ("DEA") registration number, and the prescriptions were issued electronically by co-defendant Leticia Smith, Ratanaprasatporn's office manager at the medical office Linden Medical in Brooklyn.  (See id. ¶¶ 8-9.)

As part of the scheme, crew chiefs recruited sham patients in whose names the oxycodone prescriptions were issued and paid those individuals for the oxycodone prescribed to them.  (See id. ¶ 9.)  The office issued thousands of invalid, illegitimate oxycodone prescriptions—for 30-day supplies of oxycodone 30mg pills—for scores of those fake and illegitimate patients.  (See Tr. 358.)  The crew chiefs sold the oxycodone to other dealers for further distribution.

The scope of this unlawful oxycodone operation was massive.  The pill mill charged here was at the time of the trial believed to be the largest charged in this district in recent memory.  During the nearly four-year period charged in the Superseding Indictment alone—from December 2018 to September 2022—the pill mill distributed more than 1.2 million oxycodone pills, which contained more than 36 kilograms of pure oxycodone.  (PSR ¶ 8.)  But the pill mill

began to operate years before December 2018. From April 2015 to October 2022, the pill mill distributed approximately 1.6 million tablets of oxycodone 30 mg in the names of several hundred sham patients. Just 14 pharmacies dispensed more than 50% of the total oxycodone issued. As explained at trial, the street value for each oxycodone 30 mg tablet is $30 in the New York tri-state area. (Tr. 929-30.) Thus, the street value of the oxycodone unlawfully dispensed in the scheme totaled more than $48 million.

C.    The Defendant's Oxycodone Trafficking

As many pharmacies refused to fill Ratanaprasatporn's oxycodone prescriptions, crew chiefs in the conspiracy found complicit pharmacies to fill the illegitimate oxycodone prescriptions. (See GX 1111-3.9 (co-defendant Michael Kent looking for pharmacist with right "vibe").) The conspiring pharmacists—including the defendant and co-defendants Bassam Amin, Omar Elsayed, and Yousef Ennab—were willing to fill the oxycodone prescriptions unlawfully as part of the scheme. As explained at trial, pharmacists are necessary in this type of diversion scheme because street dealers cannot get real oxycodone without the help of DEA registrants. (See Tr. 934; see also Tr. 1034-35 ("Prescription medications require a doctor's order and a pharmacist to dispense it because all prescription medications are inherently dangerous. If you don't take those medications the right way, you can be harmed.").)

As explained above, the scheme started in 2015. The defendant graduated from pharmacy school that year. He took a cavalier approach to his profession, publicly calling himself a "legal drug dealer" multiple times. (See, e.g., GX 616; GX 1103-2.9.) The defendant joined the scheme out of greed. (See, e.g., GX 1101-1.4 (Hassan to co-conspirator: "Greed makes your blind and the line between right and wrong becomes blurred… you end up making stupid decisions and justify them in your head[.]").) He personally filled oxycodone prescriptions he knew to be unauthorized and invalid, and he sold that oxycodone to street dealers. He also directed pharmacists working at his numerous pharmacies to sell oxycodone to those dealers as well. Some of the filled prescriptions were for Brooklyn residents who had their identities stolen as part of the scheme. (See GX 358.)

The defendant joined this scheme first as a supervising pharmacist of one of the pharmacies – Nile Rx – that partnered early with Smith, Kent, and others. Amin testified at trial that he saw Kent bring cash for oxycodone at Nile Rx. (Tr. 1244.) The defendant expanded to numerous other pharmacies in this district, and he exercised outsized control over those pharmacies.[1] (See, e.g., GX 1103-2.1.) As part of the scheme, the defendant had his pharmacies

---

[1]    The defendant admitted to Probation that he is an owner of nine pharmacies, including: Nile City Pharmacy Inc. located at 40-10 25th Avenue, Astoria, NY (50% ownership interest); Marcy Pharmacy, located at 170 Throop Ave, Kent, and others. (Tr. 1244.) The defendant expanded to Sunset Corner Pharmacy, located at 6002 4th Ave, Brooklyn, NY (33% ownership interest); Hylan Care Pharmacy, located at 1509 Hylan Blvd., Staten Island, NY (42.5% ownership interest); Umamah-Pitkin Pharmacy, located at 2231 Pitkin Ave, Brooklyn, NY (33% ownership interest); NY Med Pharmacy, located at 6924 4th Ave, Brooklyn, NY (75% ownership interest); Healthwise Pharmacy, located at 1233 Nostrand Ave, Brooklyn, NY (33% ownership interest); Downtown RX Pharmacy, located at 180 Atlantic Ave, Brooklyn, NY (45% ownership interest); and 95th Street Pharmacy, located at 9502 3rd Ave, Brooklyn, NY (37.5% ownership interest).

operate as a ring, with Kent sometimes filling multiple prescriptions at multiple pharmacies of the defendant at or around the same time. (See, e.g., GX 1112-2.10.) The ring worked closely with Smith and others. Smith described her conversation with the defendant in June 2022, when he called her personal cellphone and said he wanted to expand the operation to Downtown Rx. (See Tr. 423; GX 1112-2.19).

The defendant owned at least 19 pharmacies in this district during the scheme.[2] (See GX 261; see also GX 1103-2.1.) The defendant typically partnered in each pharmacy with at least another pharmacist who served as the public-facing "pharmacist in charge" or "supervising pharmacist." For instance, the defendant partnered with Amin at Prospect Care, Elsayed at Downtown Rx, and Ennab at Forest Care. While the defendant was a signer on the largest number of bank accounts associated with the pharmacies and was considered the boss of the pharmacy ring, his ownership interests in most of the pharmacies were intentionally concealed from the New York State Board of Pharmacy and other regulatory bodies. Elsayed and Ennab both submitted signed documents to the New York State Board of Pharmacy under penalty of perjury asserting, falsely, that each was the sole owner of their respective pharmacies. In short, the defendant's deputies helped to make sure his pharmacies would appear separate and distinct from each other—as opposed to part of a single criminal ring. (See GX 291; see also Tr. 1083 ("The boards will do background checks on the owners. They don't want people who may try to operate an illegal drug operation[] . . . .").)

New York State Department of Health Bureau of Narcotic Enforcement ("BNE") data shows that at least seven of those pharmacies—Downtown Rx, Forest Care, Nile City, Nile Ridge, Nile Rx, Prospect Care, and Sunset Corner—dispensed oxycodone tablets pursuant to prescriptions issued under Ratanaprasatporn's credentials. These pharmacies filled 1,039 oxycodone prescriptions, totaling 120,820 tablets, of which 108,900 tablets were oxycodone 30

---

The defendant also reported owning Nile Ridge Pharmacy, located at 6922 4th Ave, Brooklyn, NY. (PSR ¶ 93.) In addition, according to his submission to the New York Board of Pharmacies, Hassan owned Nile RX Pharmacy Inc., located at 6924 4th Ave, Brooklyn, NY. (GX 294.)

[2] According to bank account signature cards and the defendant's own text messages, these pharmacies are Downtown Rx, Forest Care, Health-Wise, Hendrix, Hylan Care, Hylan Medicine Cabinet, Marcy, Neugard, Nile City, Nile Express, Nile Rx, Nile Ridge, NY Med, Prospect Care, Richmond Valley, Skycare Rx, Sunset Corner, Umamah-Pitkin (also known as Pitkin Drugs), and Vital Chemist. The defendant reported to Probation a 20th pharmacy: 95th Street Pharmacy in Brooklyn. (See PSR ¶ 96.) The defendant started the pharmacy in November 2022, mere weeks after the initial indictment in this case was unsealed. A 21st pharmacy—Ovington Pharma, Corp.—was registered in the name of the defendant's wife. The defendant did not report owning this pharmacy to Probation. (See PSR ¶ 98 & n.6.) As demonstrated at trial, having entities in a pharmacist's wife's name was a technique the defendant used to obscure the true ownership of the pharmacies, such as Prospect Care. (See Tr. 1283-1284; see also GX 1108-9 ("Will apply under ur wifes Name to get [Hassan's wife] off the corporation To avoid any future terminations.")

mg.  These oxycodone 30 mg tablets contained 3.3 kilograms of actual oxycodone—worth more than $3 million.  (See GX 901; Tr. 929-30.)

The above-described oxycodone 30 mg prescriptions were issued to more than 130 purported Linden Medical patients.  The defendant's pharmacies generated a steady stream of monthly revenue from a roster of illegitimate patients.  (See, e.g., GX 901.)

     D.    <u>The Defendant's Obstructive Tactics</u>

The defendant willfully ignored his extensive training as to the red flags that might indicate diversion.  As he learned in pharmacy school, red flags are "things that might cause the pharmacist to pause when presented with a prescription that initially might indicate a fraudulent prescription," such as the use of cash to pay for prescriptions, the existence of a single individual picking up multiple prescriptions from multiple patients on a single day, and a prescription's being written "a far distance from the patient and a far distance from where the prescription is being filled at the pharmacy."  (Tr. 991-95, 1020.)  All these red flags and more appeared at the defendant's various pharmacies, and the defendant, out of greed, ignored them.  The red flags were so overwhelming that the defendant issued a WhatsApp message to others in February 2020, for cover, that he "discontinued all of Dr Somsris [Ratanaprasatporn] patients in both Nile Rx and Nile Ridge."  (GX 617.)  But as the trial evidence established, he did not stop.  The defendant continued for years after the message, and the amount of oxycodone pills unlawfully dispensed by the defendant's pharmacies in September 2022 exceeded the amount of such pills unlawfully dispensed before the February 2020 WhatsApp message.  (See GX 919.)

Even worse, the defendant intentionally worked with his co-conspirators to *hide* the red flags associated with the unlawful oxycodone prescriptions at his pharmacies.  The defendant directed some supervising pharmacists at pharmacies he owned to conceal his ownership of their pharmacies.  (E.g., Tr. 1283-85; GX 291, 292, 293.)  The defendant taught other pharmacists to manipulate pharmacy computer data to make it appear that prescriptions were paid for by insurance, when they were in fact paid for in cash, a known red flag.  (PSR ¶ 37.)  He instructed other pharmacists to handle prior authorizations for Ratanaprasatporn's patients, so that Ratanaprasatporn would not become aware of the extent of the scheme.  (Id.)  He ensured that Smith would issue prescriptions for multiple medications to dilute the proportion of oxycodone prescriptions being filled, another red flag.  (Id.)  Indeed, as Smith testified, "Mohamed told me that whenever I send a prescription over to the pharmacy . . . other medications had to be sent to the pharmacy along with the oxycodone 30 milligrams because if it didn't, it could get red flagged."  (Tr. 408.)  On at least one occasion, the defendant instructed Elsayed to fabricate a prescription for a non-controlled medication and enter it into the computer system as if it had been called in by a doctor.  (PSR ¶ 22 ("Dona [sic] telephone rx for motrin and keep in file").)

Furthermore, the defendant's text messages show that he conspired with his business partner Mohammad Saleh Hassan ("Saleh") to delete incriminating test messages after he learned of the initial arrests in this matter:

       Saleh:           I cleared all my chats

       Hassan:         Kk sounds good

| | |
|---|---|
| Saleh: | Do I contact everyone privately to do the same? |
| Saleh: | Pharmacists group<br>Ownership<br>Individual pharmacy groups<br>Etc |
| Saleh: | U contact ur ppl too |
| Hassan: | Lost |
| Hassan: | Alot of messages when I transferred phones |

(GX 1101-1.7.)

Hassan's efforts to conceal the scheme and obstruct justice served to prolong the drug trafficking conspiracy and extend its scope.

### E.     The Defendant's Health Care Fraud

The defendant committed health care fraud by demanding prescriptions in the names of oxycodone patients for non-controlled medications and seeking lucrative reimbursements from insurance programs for those prescriptions. Smith testified that Hassan repeatedly asked her to issue prescriptions for expensive, reimbursable medications along with the oxycodone. She discussed this with Hassan: "I told Mohamed that the medication that he was asking for was very expensive and that the insurance company would not pay for it, that they would probably need a prior approval for the medication and that Dr. Ratana was not going to do a prior approval because it was a patient that was not even hers. And he told me not to worry about it, that he would do the prior approval." (Tr. at 429.) Amin also testified that Hassan "recommended that we ask [Kent] to bring in some medication that are highly reimbursable or ask him to bring in – or ask for prescriptions for surgical equipment, such as back braces, hand braces, or leg injuries that are associated with the prescription that he's bringing. This is something that will be beneficial to the pharmacy." (Tr. at 1265.)

This conduct is reflected in trial exhibits. In GX 1103-2.12, Hassan directed Elsayed to call oxycodone-patient Myrtle Caldwell and tell her that Elsayed was Hassan's partner and that she should switch to the Downtown RX pharmacy. Hassan stated that Elsayed should tell her that he "wants her to come to downtown But u will not dispense a single tablet of oxyconde [sic] without zegerid 180/90.. pennsaid 112/30.. meloxicam 5 mg tid #270/90 and Migranal 8/30 days," and that "[e]very rx needs multiple refills for 6 months." Later in the same chat, Hassan wrote, "Make her a profile Leave a note not to fill the oxycondee [sic] Until we get those rxs." Based on the context, it is plain that Caldwell had no medical need for Zegerid, Pennsaid, Meloxicam and Migranal, which were expensive medications covered by insurance (and therefore highly profitable for the defendant). (E.g., Tr. 1270-71.) Nevertheless, Medicare paid Downtown RX Pharmacy $471,992.48, which included $193,432.48 for diclofenac sodium (Pennsaid); $156,216.40 for Meloxicam; $76,949.20 for Omeprazole/Sodium Bicarbonate (Zegerid); and $42,031.28 for Pennsaid.

In short, *just from a single oxycodone patient*, and focusing only on the specific reimbursable medication prescriptions that Hassan demanded Elsayed extort from Caldwell, Hassan was able to defraud Medicare to the tune of nearly $500,000.[3]  It is no wonder that Hassan has reported a net worth exceeding $39 million, and this as a 35-year-old self-made pharmacist, raised under "average economic circumstances."  (PSR ¶¶ 103, 70.)

F.    The Defendant's Lack of Remorse

Before the defendant was arrested, he at least privately made tepid admissions to a co-conspirator that his actions were "wrong" and constituted "stupid decisions" that he "justif[ied] . . . in [his] head."  (GX 1101-1.4 (WhatsApp message to Saleh).)  But after his participation in this pill mill scheme was publicly revealed and his guilt was demonstrated beyond a reasonable doubt, the defendant has not accepted any responsibility for his conduct.

Shortly after the guilty verdict was pronounced, the defendant issued a public statement on social media denying any involvement in the scheme and instead feigning innocence:

> Unfortunately, due to my past partnerships with individuals who have since pleaded guilty to their crimes, I have now found myself unjustly accused as a result of their testimony.  Despite the fact that there was no evidence against me personally, the jury did not see me as an individual. . . .  I placed my faith in the trial process, believing that the truth would prevail.  However, in federal court, I was met with a system that failed to separate my case from those of my former associates, and I ultimately lost to the jury system. . . .  I remain steadfast in my belief that, with God's grace, I will emerge from this trial stronger and with my name cleared.

(Ex. A at 1.)

In his 29-page sentencing brief, the defendant gesticulates three times to the "seriousness of the offenses" (without any detail), but makes clear that he believes himself "law-abiding" and that he "maintains his innocence."  Def.'s Sentencing Submission at 2-3, 12, 28.  As the evidence at trial showed, however, this defendant was far more culpable than any of the oxycodone-peddling pharmacists he hid behind.  The defendant shows no remorse whatsoever for his flagrantly unlawful conduct.

II.    Guidelines Calculation

The government agrees with the PSR's calculation that the defendant's total offense level is 41 (see PSR ¶¶ 49-57), as set forth below:

---

[3]    Medicare paid Nile RX Pharmacy, just for Caldwell, $18,203.06 for dihydroergotamine mesylate (Migranal); $15,757.38 for Pennsaid, and $6,984.50 for Zegerid.  See GX 913.  Notably, for John Sanders, another crew chief (Tr. 361), Medicare paid Nile RX $249,712.77.  Id.

| | | |
|---|---|---|
| Base Offense Level (§§ 2D1.1(a)(5), 2D1.1(c)(3)) | | 34 |
| Plus: | Abuse of Trust and Special Skill (§ 3B1.3) | +2 |
| Plus: | Role Adjustment (§ 3B1.1(b)) | +3 |
| Plus: | Obstruction of Justice | <u>+2</u> |
| Total: | | 41 |

The government agrees with the PSR's determination that the defendant's criminal history category is I. Thus, the total offense level of 41 carries an advisory Guidelines range of 324-405 months' imprisonment. (See id. ¶ 101.)

     The defendant objects to all the above-applied enhancements. For the reasons stated in the government's letter responding to the defendant's objections (see ECF No. 467, incorporated herein by reference), the Court should apply the above-listed enhancements. Contrary to what the defendant argues (see Def.'s Sentencing Submission at 28-29), Second Circuit case law shows that he deserves no hearing under United States v. Fatico, 579 F.2d 707 (2d Cir. 1978). See, e.g., United States v. Rutigliano, 614 F. App'x 542, 547 (2d Cir. 2105) (affirming decision not to hold Fatico hearing because defendant was "raising issues litigated at the trial" and was "asking essentially for [the Court] to have another trial on some of these issues"); United States v. Cacace, 796 F.3d 176, 190 (2d Cir. 2015) (per curiam) (affirming decision not to hold Fatico hearing because "district court was entitled to rely on the trial evidence"); McLean v. United States, No. 08-CR-789, 2016 WL 3910664, at *12 (S.D.N.Y. July 13, 2016) (Sullivan, J.) ("[T]he Court is permitted to rely on the trial record to resolve any disputed sentencing issues.").

     In addition, the Court should not credit the defendant's argument that he knew that the oxycodone prescriptions from Ratanaprasatporn were illegitimate only after February 2, 2020, when he sent a text message to his business partners informing them that "[a]s of this Morning I discontinued all of Dr Somsris patients in both Nile Rx and Nile Ridge."

     While the quoted text message certainly demonstrates knowledge by February 2, 2020, record evidence shows that Hassan knew or consciously avoided knowing that the Ratanaprasatporn prescriptions were illegitimate well before then. As this Court put it, the WhatsApp message was Hassan "simply creating a front." (ECF No. 471 at 24.) Amin testified that Hassan started Nile Rx in 2016 or 2017, owned the pharmacy, and worked there as well. (See Tr. 1204, 1211-12.) The vast majority of the Ratanaprasatporn oxycodone prescriptions unlawfully dispensed at Nile Rx occurred before the February 2020 text message. (See, e.g., GX 904.) As Smith testified, she spoke with Hassan while he was a pharmacist at Nile RX filling Ratanaprasatporn-prescribed oxycodone prescriptions, and he told her that "other medications had to be sent to the pharmacy along with the oxycodone 30 milligrams because if it didn't, it could get red-flagged." (Trial Tr. 408.) This conversation must have occurred before Hassan stopped filling Ratanaprasatporn oxycodone prescriptions at Nile RX, because, given what it conveyed, it is clear that he intended to continue to fill such prescriptions at the time he spoke with Smith. In addition, Amin testified that he worked at Nile Rx before opening Prospect Care with the defendant in 2019 (that is, before the defendant had sent the WhatsApp message). (See Tr. 1207-08.) As this Court explained, "Amin saw Kent pay prescriptions in cash" at Nile Rx,

and "there was abundant evidence that Hassan—who was the owner and supervising pharmacist of Nile RX and interacted with Kent—knew that his pharmacies were filling oxycodone prescriptions illegally, and actively encouraged it." (ECF No. 471 at 39; see also Tr. 1244.)

In addition, BNE records admitted at trial showed numerous red flags raised by the oxycodone prescriptions filled at Nile RX from the start. See GX 241 (BNE records for Ratanaprasatporn prescriptions). The first two Ratanaprasatporn-issued oxycodone prescriptions were filled at Nile RX on December 2, 2017. Both prescriptions were for oxycodone 30 mg. The names on the prescriptions were John Sanders and Individual-1. John Sanders was a crew chief, and Individual-1 was in Kent's crew. (Tr. 361 (discussing John Sanders); GX 1111-7 (listing names of Kent's crew members, including Individual-1's.) Early on, Hassan also filled prescriptions for at least three members of the Kent family who bear his last name. All three Kents received identical prescriptions for 120 tablets of oxycodone 30 mg, issued under Dr. Ratanaprasatporn's credentials. This should have triggered scrutiny in a pharmacist attempting to fill legitimate prescriptions for controlled substances. (Tr. 1073 (government expert noting that patients with the same last name receiving the same controlled substance from the same prescriber is a red flag); 1717 (defense expert agreeing it would not be common for multiple patients in the same family to receive the same controlled substance from the same prescriber).)

From December 2017 through December 2018, moreover, Nile RX filled oxycodone 30 mg prescriptions for 10 different people ostensibly from Ratanaprasatporn's practice – all while Ratanaprasatporn was a family practitioner and pediatrician, not a pain management doctor. (Tr. 528 (Ratanaprasatpon maintained a general family practice); GX 241; Tr. 1090 (Catizone) (red flag where one prescriber writes oxycodone 30 mg prescriptions for multiple patients, and the prescriber is not a pain management doctor or cancer specialist).)

The residential addresses of the Nile RX patients also raised red flags. All of the Ratanaprasatporn patients who filled oxycodone 30 mg prescriptions at Nile RX lived in Brownsville and/or East New York, miles away from Bay Ridge-based Nile RX. (See GX 241; GX 294 (Nile RX located at 6924 4th Ave.) And the Linden Medical practice was also located in East New York, far from Nile RX. (Tr. 328 (doctor's office located at 2108 Linden Boulevard, Brooklyn).) Hassan learned in pharmacy school that these distances raised red flags. Hassan's pharmacy law professor, Joseph Bova, testified to this:

> Q: What were some of the things that were taught to your students in your course that might be something that would cause them to pause?
>
> A: A patient or caregiver that picks up multiple prescriptions from multiple patients on the same day, *a prescription written by a prescriber . . . in one borough a far distance from the patient and a far distance from where the prescription is being filled at the pharmacy*, perhaps prescriptions that are for a long duration of therapy, prescriptions outside of the scope of practice of the person writing it.

(Tr. 991-992 (emphasis added).)

As Professor Bova indicated, the long duration of oxycodone therapy would also have raised a red flag for Hassan, as Nile RX's supervising pharmacist. For example, Individual-

1 received prescriptions for oxycodone 30 mg <u>26 times</u> between December 2017 and January 2020. GX 241. John Sanders received prescriptions for oxycodone 30 mg <u>24 times</u> between December 2017 and January 2020 (and two members of the Sanders family bearing his last name each received oxycodone 30 mg prescriptions over the course of 11 months, in the identical date range from March 2019 through January 2020). <u>Id.</u>

In short, ample evidence admitted at trial shows that numerous red flags were present that put the defendant, as the supervising pharmacist at Nile RX, on notice that diversion was occurring. The defendant should be responsible for all of the oxycodone 30 mg prescriptions that were filled at pharmacies he owned, both before and after February 2020.

III.  <u>The Appropriate Sentence</u>

A.  <u>Legal Standards</u>

1.  *Sentencing*

The Court "shall impose a sentence sufficient, but not greater than necessary," to achieve the goals of sentencing. 18 U.S.C. § 3553(a). "[I]n determining the particular sentence to be imposed," the Court "shall consider" certain factors set forth in § 3553(a), including the applicable Guidelines range. <u>Id.</u>

The Court must "correctly calculat[e] the applicable Guidelines range" because a miscalculation constitutes "significant procedural error." <u>Gall v. United States</u>, 552 U.S. 38, 49, 51 (2007). The Guidelines range "should be the starting point and the initial benchmark." <u>Id.</u> at 49. Still, the Court "should not presume" the reasonableness of the calculated Guidelines range and "must make an individualized assessment based on the facts presented." <u>Id.</u> at 50.

The Court also must "adequately explain the chosen sentence—including an explanation for any deviation from the Guidelines range." <u>Id.</u> at 51. A "significant departure or variance from the recommended Guidelines range 'should be supported by a more significant justification than a minor one.'" <u>United States v. Martinez</u>, 110 F.4th 160, 178 (2d Cir. 2024) (quoting <u>United States v. Mumuni</u>, 946 F.3d 97, 107 (2d Cir. 2019)). The Court "must faithfully evaluate the record to ensure that the sentence imposed accurately and adequately reflects the seriousness of the offense conduct." <u>Id.</u> (quoting <u>Mumuni</u>, 946 F.3d at 106).

2.  *Forfeiture*

Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal forfeiture sought in this case. Rule 32.2 is not limited to specific property but may include the imposition of a personal money judgment. Rule 32.2(b)(1)(A) provides that, if the government seeks a personal money judgment, the Court must determine the amount of money that the defendant will be ordered to pay. Fed. R. Crim. P. 32.2(b)(1)(A); <u>see also</u> <u>United States v. Candelaria-Silva</u>, 166 F.3d 19, 42 (1st Cir. 1999) ("A criminal forfeiture may take several forms[,] . . . [including] an <u>in personam</u> judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense.").

Forfeiture here is authorized under 21 U.S.C. § 853. As a result of his narcotics convictions, the defendant must forfeit under 21 U.S.C. § 853(a): (1) any property constituting,

or derived from, any proceeds obtained directly or indirectly as a result of such offenses; and (2) any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offenses.

The Supreme Court has recognized that criminal forfeiture is part of a defendant's sentence and is mandatory when the defendant has been convicted of an offense giving rise to forfeiture. See United States v. Monsanto, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited."); accord United States v. McGinty, 610 F.3d 1242, 1246 (10th Cir. 2010) (stating that language in forfeiture statute "express[es] Congress's intent that criminal forfeiture is both mandatory and broad"); United States v. Bourne, No. 08-CR-888 (NGG), 2012 WL 526721, at *2 (E.D.N.Y. Feb. 15, 2012) (finding that entry of money judgment is mandatory, even if defendant has no assets).

In contrast to the guilt phase of a criminal trial, the government bears the burden of establishing the amount of money subject to forfeiture only by a preponderance of the evidence. See United States v. Capoccia, 503 F.3d 103, 116 (2d Cir. 2007) (Sotomayor, J.) ("Sentencing courts determine forfeiture amounts by a preponderance of the evidence."); United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing).

Further, Rule 32.2(b)(1)(B) provides that the Court's determination may be based on evidence already in the record, as well as on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. See Capoccia, 503 F.3d at 109; United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011) ("[D]istrict courts may 'use general points of reference as a starting point' for a forfeiture calculation and 'make reasonable extrapolations' supported by a preponderance of the evidence." (quoting United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011)).

The government may seek gross proceeds, not merely profits. See United States v. Khan, 761 F. App'x 43, 47 (2d Cir. 2019) (summary order); United States v. Colon, 522 F. App'x 61, 62-63 (2d Cir. 2013) (summary order); United States v. Robilotto, 828 F.2d 940, 948 (2d Cir. 1987); United States v. Tanner, 942 F.3d 60, 68 (2d Cir. 2019) (quoting Honeycutt v. United States, 581 U.S. 443, 451-52 (2017)); accord United States v. Pastore, No. 18-2482, 2022 WL 2068434, at *6-7 (2d Cir. June 8, 2022) (summary order) (upholding forfeiture based on showing that defendant "at one point possessed proceeds"); United States v. Guerrier, No. 20-3469, 2022 WL 610338, at *2-3 (2d Cir. Mar. 2, 2022) (summary order).

Importantly, the government is not required to provide a precise calculation of the amount of money a defendant must forfeit. Treacy, 639 F.3d at 48. Instead, the money judgment amount may be reasonably estimated based upon the available information. Id. Sentencing courts may consider trial evidence and hearsay, as well as "evidence or information submitted by the parties and accepted by the court as relevant and reliable," in determining forfeiture. Fed. R. Crim. P. 32.2(b)(1)(B); see also Capoccia, 503 F.3d at 109-10 (citing United States v. Gaskin, 364 F.3d 438 (2d Cir. 2004), for proposition that Second Circuit "has already approved of sentencing courts' consideration of trial evidence in determining forfeiture").

Lastly, the government need not prove that the defendant may be able to pay the forfeiture money judgment. It need only prove, by a preponderance of the evidence, that the amount it seeks is forfeitable. See United States v. Awad, 598 F.3d 76, 78-79 (2d Cir. 2010) (per curiam) ("[M]andatory forfeiture is concerned not with how much an individual has but with how much he received in connection with the commission of the crime." (citation omitted)).

### 3. Supervised Release

This Court "enjoys broad discretion when setting the conditions of supervised release." United States v. A-Abras Inc., 185 F.3d 26, 35 (2d Cir. 1999) (citation omitted). The Court may "impose special conditions of supervised release that are reasonably related to certain statutory factors governing sentencing, involve no greater deprivation of liberty than is reasonably necessary to implement the statutory purposes of sentencing, and are consistent with pertinent Sentencing Commission policy statements." United States v. Thompson, 143 F.4th 169, 176 (2d Cir. 2025) (quoting United States v. Farooq, 58 F.4th 687, 694 (2d Cir. 2023)). The Court must "make an individualized assessment" as to the defendant and "state on the record the reason for imposing" the condition. Id. at 177 (quoting United States v. Betts, 886 F.3d 198, 202 (2d Cir. 2018)).

Relevant here, occupational and business restrictions may be imposed "to the extent that they 'are reasonably necessary for the purposes indicated in section 3553(a)(2).'" United States v. Doe, 79 F.3d 1309, 1320 (2d Cir. 1996) (quoting 18 U.S.C. § 3563(b)). Similarly, U.S.S.G. § 5F1.5 provides that such restrictions may be imposed "to the minimum extent necessary to protect the public." Id. (quoting U.S.S.G. § 5F1.5).

Accordingly, occupational and business restrictions may be ordered as "reasonably necessary" if "there is reason to believe that, without such a restriction, the defendant will continue to engage in unlawful conduct similar to that for which he was convicted." Id.; see also id. at 1321 (authorizing imposition of occupation restrictions "if reasonably necessary to protect the public from further crimes of the defendant," but not "to any greater extent than reasonably necessary to achieve that purpose").

Relevant here, because occupational and business restrictions do not implicate a constitutional interest, the standard is more flexible than narrow tailoring. The Court does not abuse its discretion in imposing an occupational or business restriction just because it "could have easily imposed [other] conditions to address any concerns that it may have had." United States v. Hurtado, 756 F. App'x 63, 70 (2d Cir. 2018) (occupational restriction).

Furthermore, the restriction "must be based on the offense of conviction." United States v. Peterson, 248 F.3d 79, 85 (2d Cir. 2001) (per curiam). Only a "reasonably direct relationship" is required, 18 U.S.C. § 3563(b)(5); the "crimes protected against by the employment restriction" need only be "close enough" to the crimes of conviction "to protect the public from reasonably similar crimes," United States v. Betts, 511 F.3d 872, 875 (9th Cir. 2007). "The public is entitled to be protected against crimes flowing from the same character trait demonstrated by" the convictions, not only "substantially identical" crimes. Id.

B. <u>The Appropriate Sentence</u>

The government agrees with Probation that a significant term of incarceration is necessary here to reflect the seriousness of the defendant's conduct, to promote respect for the law, to provide just punishment for the offense, and to deter the defendant and other pharmacists from future criminal conduct.

*1. A Lengthy Sentence is Warranted Given the Nature and Circumstances of the Offense Conduct*

The nature and circumstances of the offense counsel in favor of a substantial prison sentence. Unlawful narcotics dealing is among "the most serious crimes there is." <u>United States v. Fiore</u>, 467 F.2d 86, 90 (2d Cir. 1972). Put another way, "drug-related crimes are polluting . . . urban centers, frequently destroying the lives of the victims who become addicted to the illegal substances, and are leading to overall societal and familial decay." <u>Elbert v. United States</u>, No. 09-CR-285 (VLB), 2014 WL 4182400, at *3 (D. Conn. Aug. 21, 2014). And the "opioid epidemic has wrought a terrible toll on our nation and so many communities within it." <u>United States v. McKinnie</u>, 21 F.4th 283, 294 (4th Cir. 2021); <u>see also</u> <u>United States v. Robinson</u>, 892 F.3d 209, 215 (6th Cir. 2018) (holding that district court does not abuse its discretion "in considering the effect of the opioid epidemic" in state). In particular, oxycodone is "one of the most dangerous drugs available on the black market today," and flooding oxycodone on the streets helps "to perpetuate the horrible pill epidemic that is, in turn, fueling the heroin epidemic that is leading to more and more deaths each year." <u>United States v. Thompson</u>, No. 15-CR-168 (AWT), 2022 WL 1239946, at *2-3 (D. Conn. Apr. 27, 2022) (citation omitted) (168-month sentence).

The above-described conduct strikes at the underpinnings of a critical component of our society, the healthcare system. <u>See, e.g.</u>, <u>Robinson</u>, 892 F.3d at 215 (affirming sentence based in part on opioid epidemic's "extraordinarily burdensome" effect on law enforcement and local health-care system, as well as "devastating effects of those drugs and their widespread local availability, as facilitated by dealers including" defendant). Indeed, the defendant's conduct was particularly egregious because he served as a trusted gatekeeper to dangerously addictive drugs, and he abused the trust conferred upon him by his doctoral program, state-pharmacy-licensing authorities, and the patients he served. The defendant grew up in a stable, middle-class family. Yet despite the advantages and opportunities afforded to the defendant, the defendant willfully used his pharmacies as vehicles to sell prescription painkillers to drug dealers. Oxycodone destroys lives, kills people, and devastates families and communities. The defendant knew better, but his knowledge did not deter his criminal conduct, which shows utter disregard to the detrimental impact of opioids on the community.[4] His conduct was part of a calculated, rational plan effectuated over a period of more than four years, and motivated by greed. The defendant enabled addiction and contributed to the crime and other social ills caused by the drug economy.

---

[4]       Given the defendant's personal experiences with drug abuse (not to mention his training in pharmacy school regarding the dangerousness of the medications he was dispensing), it is appalling that he describes his conduct in the instant case as "victimless." <u>See</u> Def.'s Sentencing Submission at 1, 14-15.

His actions were thwarted only because law enforcement discovered the oxycodone scheme and dismantled it.

## 2. A Lengthy Sentence Will Deter Similar Conduct

Specific deterrence is of the utmost importance here given the fact that he is still working in the pharmacy business, with ownership interests in nineteen pharmacies, and he still purports to believe that he has done nothing wrong. The defendant may or may not lose his pharmacy license; even if he does lose his license and can no longer fill prescriptions, however, most of the harm done in this matter was through the defendant's instructions to other pharmacists. Moreover, losing his license will not divest him of his ownership interests in his pharmacy empire. The defendant will remain in a control position, able to exercise significant authority over nineteen pharmacies.

The defendant's egregious and pervasive efforts to conceal his criminal conduct, and the manner in which he routinely hid behind others, as well as his obstructive conduct detailed above, further show that a substantial sentence is necessary to deter the defendant from continuing to commit crimes. The defendant was at the core of the charged conspiracies. He manipulated the businesses he owned and controlled to supply drugs to the crew chiefs charged in this matter. He served at Nile RX as a supervising pharmacist, where he was directly responsible for the illegal dispensing of an enormous amount of oxycodone; as an owner of Prospect Care, Forest Care, and Downtown RX, he groomed other pharmacists to play similar roles. It was Hassan who taught Amin how to falsify prescription records on the Prospect Care computer system; Hassan who offered to move some of the oxycodone patients out of Downtown RX so that Elsayed would not have trouble with the DEA; and Hassan who connected Kent with Ennab. Hassan also encouraged his pharmacists to engage in health care fraud in the Pharmacists United WhatsApp group—a group Hassan described as "pharmacy school" for his pharmacists. (GX 1103-7.35.) Hassan hid behind his partners, and he hid behind the February 2, 2020 text message, which he seemed to believe provided a paper cover behind which he continued his drug trafficking activities with impunity. As the jury found, however, the defendant's play for plausible deniability served only to showcase his guilt. The evidence showed that the defendant was the "big boss." Tr. at 1233; GX 1103-7.31.

In addition, "general deterrence is a major factor" in narcotics cases. United States v. Bowman, No. 92-CR-392 (LAP), 2020 WL 470284, at *2 (S.D.N.Y. Jan. 29, 2020) (noting that 26 years of incarceration is sufficient to effect general deterrence); see also 18 U.S.C. § 3553(a)(2)(B). "The need for general deterrence is particularly acute in the context" of crimes like these because health care professionals such as the defendant and Hassan "are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." United States v. Johnson, No. 16-CR-457 (NGG), 2018 WL 1997975, *5 (E.D.N.Y. Apr. 27, 2018) (quoting United States v. Stein, No. 09-CR-377 (JBW), 2010 WL 6781222, at *3 (E.D.N.Y. Feb. 25, 2010)).

A pharmacist's choice to unlawfully dispense narcotics, commit healthcare fraud, and engage in a coverup reflects conduct "'more rational, cool, and calculated than sudden crimes of passion or opportunity'—which makes the case a 'prime candidate[] for general deterrence.'" United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (citation omitted). "A serious sentence is required to discourage such crimes," Johnson, 2018 WL 1997975, at *5,

especially when those crimes involve perpetuating an opioid epidemic in the local community, see United States v. Davis, 82 F.4th 190, 201-02 (2d Cir. 2023) (endorsing "need to deter local crime" in sentencing analysis, and observing that general deterrence "incorporates some consideration of persons beyond the defendant" because it is "about preventing criminal behavior by the population at large" (citation omitted)); see also United States v. Kincaid, 631 F. App'x 276, 279, 282-83 (6th Cir. 2015) (affirming 830-month sentence for 1.7 million oxycodone pills).

Furthermore, a significant prison sentence will make clear to pharmacists that drug laws will be enforced vigorously, especially where those laws have been broken by healthcare professionals who are entrusted to heal, not hurt, the community. The sentence must be set appropriately to deter licensed professionals beyond the defendant. See United States v. Maniego, 710 F.2d 24, 29 (2d Cir. 1983) (rejecting defense argument that sentence was unfair "example to the Bar" because "deterrence is not an inappropriate sentencing objective 'with respect to conduct for which the defendant is blameworthy'" (citation omitted)). Indeed, on the government's appeal, the Eleventh Circuit has vacated a sentence in a health care fraud case where the district court's reasoning suggested that doctors, pharmacists, lawyers, and other licensed professionals "cannot be deterred by the threat of a prison sentence from committing a crime that will result in loss of their license anyway." United States v. Howard, 28 F.4th 180, 208 (11th Cir. 2022). "Anyone with a license to practice a profession could abuse the privileges that come with that license to commit crimes without fear of being sent to prison in order to deter others from using their licenses to commit similar crimes." Id. "That cannot be right, and it isn't right." Id.

Opioid diversion is a particularly pernicious crime for several reasons. Not only does diversion harm the community by feeding the cycle of opioid addiction, but it is relatively easy to conceal. Even systematic opioid diversion by a single unscrupulous pharmacist or doctor can go on for years—as occurred in this case—before it is detected by law enforcement. Accordingly, a significant prison sentence is needed to warn similarly situated individuals that such crimes come with serious consequences.

In its legal research, the government has found significantly more pill-mill cases against crew chiefs and doctors than against pharmacists. This makes sense. It is uniquely difficult to investigate and prove the guilt of pharmacists beyond a reasonable doubt in narcotics cases. The obvious point should be stated first: pharmacists are entitled to lawfully possess drugs on a daily basis in a variety of circumstances, and thus the obvious inference of criminality arising from the fact of bulk possession (an inference used to great effect in the typical narcotics case) is unavailable in criminal cases against pharmacists. Relatedly, it is easy for culpable pharmacists to hide their criminality; the schemes are often structured such that the fake prescriptions are interspersed among legitimate ones, making the fake ones harder to monitor and track. Separately, direct evidence of willfulness is often hard to uncover among sophisticated defendants with significant education and training. And the government often cannot rely on certain red flags available in criminal cases against, for instance, doctors, because pharmacists are not the ones medically examining the patients for whom they are filling prescriptions. It often takes damning evidence—such as the smoking-gun electronic communications and wiretap recordings presented at trial—to convict a pharmacist, and such evidence is difficult to obtain in the mine-run narcotics case.

Thus, this pharmacist case presents a key opportunity to impose a sentence reflecting the grave need for general deterrence. And "[l]eniency undermines general deterrence." Id. at 209.

### 3. A Lengthy Sentence is Necessary to Avoid Unwarranted Sentencing Disparities

A substantial prison sentence is necessary to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6)—a sentencing requirement to "consider nationwide sentencing disparities," United States v. Gahagen, 44 F.4th 99, 113 (2d Cir. 2022) (quoting United States v. Frias, 521 F.3d 229, 236 (2d Cir. 2008)). In a pill mill case, the Fifth Circuit affirmed a 151-month sentence imposed on a pharmacist whose pharmacy (where he exclusively filled his prescriptions) sold only $31,000 of controlled substances (or about 4.2% of the pharmacy's total revenue) total—both lawfully and unlawfully—over two years in the scheme, and who the district judge found had run 90% of his pharmacy business in a "legitimate" fashion. See Capistrano, 74 F.4th at 766, 782; Capistrano, 74 F.4th 756 (5th Cir. 2023), No. 21-10620, ECF No. 224. The Eleventh Circuit, moreover, affirmed a 188-month sentence imposed on a pharmacist who filled nearly 500 unlawful opioid prescriptions over the course of two years. See United States v. Gbenedio, 95 F.4th 1319, 1323-24 (5th Cir. 2024). The defendant was responsible for filling more than 900 oxycodone 30 mg prescriptions over a period of more than four years. The defendant is far more culpable than the pharmacists in Capistrano and Gbenedio.

A substantial sentence is also consistent with sentences imposed on comparable non-pharmacist health care professionals who willfully flooded oxycodone on the streets. See, e.g., United States v. Gowder, 841 F. App'x 770, 785 (6th Cir. 2020) (affirming 348-month sentence for clinic owner and scheme leader in part because he disregarded the law and lacked remorse, and because sentence needed to "deter people from engaging in such a profitable and difficult-to-detect crime"); United States v. Hubbard, 843 F. App'x 667, 675-76 (6th Cir. 2019) (affirming 360-month sentence for doctor because he "had created a lot of damage to his community through his distribution of thousands and thousands of pills, and that, to curb the epidemic of prescription drug abuse in [his state], [he] was one of the individuals that needed to be guarded against"); United States v. Dixon, 797 F. App'x 95, 97-98 (4th Cir. 2019) (affirming 240-month sentence for doctor based on 23 fake patients and 756 prescriptions issued over 37 months).

A substantial sentence here is also warranted in light of serious sentences imposed on less culpable pill-mill defendants who did not serve as licensed professionals in the scheme. See, e.g., United States v. Mehl, 785 F. App'x 28, 29-30 (3d Cir. 2019) (affirming 180-month sentence for crew chief based on 2.3 kilograms of actual oxycodone unlawfully dispensed over 34 months); United States v. Bradley, 897 F.3d 779, 785-86 (6th Cir. 2018) (affirming 204-month sentence for dealer and scheme manager based on 186,300 oxycodone pills over eight months); United States v. Dalton, 574 F. App'x 639, 647 (6th Cir. 2014) (affirming 235-month sentence for dealer and scheme leader based on 200 grams of actual oxycodone over 13 months); United States v. Goduto, 568 F. App'x 843 (11th Cir. 2014) (affirming 168-month sentence imposed on crew chief based on 1.0 kilogram of actual oxycodone over 21 months); United States v. Landron-Class, 696 F.3d 62, 67, 76-78 (1st Cir. 2012) (affirming 240-month sentence

for crew chief based on proof at trial of 676.5 grams of actual oxycodone unlawfully dispensed over 32 months, despite defendant's prior attempts at cooperation and multiple proffer interviews with government); United States v. Espinola, 242 F. App'x 709, 711 (1st Cir. 2007) (affirming below-Guidelines 148-month sentence for crew chief based on proof at trial of about 1.6 kilograms of actual oxycodone unlawfully dispensed over two years), reinstated, Judgment, No. 06-2340 (1st Cir. Apr. 11, 2008).

Therefore, because it is sufficient but not greater than necessary to reflect the seriousness of the defendant's crimes, the need for both specific and general deterrence, and the need to prevent sentencing disparities among similar defendants, a comparably substantial sentence is appropriate here.

C.     The Appropriate Forfeiture Amount

This Court should impose forfeiture of $1,100,791.87, which is a reasonable estimate of the narcotics proceeds the defendant obtained during the scheme.

As explained above, the defendant, Amin, and others all operated in the same criminal ring. Although the government did not obtain ledgers reflecting the defendant's split of the cash obtained at every one of his pharmacies, the government offered at trial example pages from bookkeeping ledgers at Prospect Care—the pharmacy in the defendant's ring operated by Amin. (See GX 514; GX 547; see also Tr. 1286-88 (discussing certain ledger pages); GX 1108-13 (WhatsApp conversation between the defendant and Amin about splitting cash).) Because Kent was a primary crew chief at all of the defendant's pharmacies, it is reasonable to extrapolate the amount of the defendant's drug proceeds from the amount of drug proceeds obtained by Amin.

As Amin explained at trial, the cash at Prospect Care was split in half between him and the defendant as part of the scheme. (See Tr. 1217, 1256, 1260.) Amin's testimony was corroborated by the ledger pages stored in the Prospect Care safe. The ledger pages showed Amin and the defendant each taking cash from the safe multiple times each month during the scheme. The chart below includes a selection of the months, as well as the number of unlawful prescriptions filled during each of those months. (See GX 514; GX 547; Tr. 1286-87; see also GX 544-1 (prescription records at Prospect Care).)

| Month | Amin's Cash Split Based on the Ledger | Hassan's Cash Split Based on the Ledger | Prescriptions Filled | Average Cash Per Prescription for each Pharmacist |
|---|---|---|---|---|
| 10/2020 | $7,000 | $7,000 | 10 | $700 |
| 01/2021 | $9,500 | $9,730 | 9 | $1,055.56 |
| 03/2021 | $9,500 | $9,730 | 9 | $1,055.56 |
| 04/2021 | $9,000 | $9,000 | 10 | $900 |
| 05/2021 | $15,000 | $15,000 | 13 | $1,153.85 |
| 06/2021 | $10,000 | $10,500 | 11 | $909.09 |

Based on the above-described example months in the ledger pages and Amin's testimony, a reasonable estimate for the average cash given to each pharmacist per prescription across the six example months is $962.34. Thus, it is reasonable to estimate that each pharmacist

in the defendant's ring made at least $962.34 in cash per prescription, and that the defendant separately made about $962.34 as well.

As described above, the defendant was responsible for more than 1,000 oxycodone prescriptions issued under Ratanaprasatporn's credentials. Of these, 939 prescriptions were for oxycodone 30 mg, filled at Nile RX, Nile City, Nile Ridge, Downtown RX, Prospect Care, Forest Care, and Sunset Corner. (See GX 241.) Because the defendant or the pharmacists under his direction filled 939 prescriptions for oxycodone 30 mg prescriptions at the defendant's pharmacies during the scheme, with the plan that the defendant would receive approximately $962.34 for each prescription, the defendant made a conservative estimate of $903,637.26 in oxycodone proceeds. Furthermore, even though the forfeiture laws are "concerned not with how much an individual has," Awad, 598 F.3d at 78-79 (citation omitted), the defendant clearly can afford to pay the forfeiture amount, for the reasons set forth above.

In addition, the payments from Medicare for Myrtle Caldwell to both Downtown RX and Nile RX for the expensive, reimbursable drugs Meloxicam, Migranal, Pennsaid, and Zegerid, should be incorporated into the forfeiture money judgment. This money constituted a portion of Hassan's proceeds from the drug-trafficking scheme, since he required oxycodone patients, including Caldwell, to bring prescriptions for these medications to his pharmacies in exchange for filling the oxycodone prescriptions. As GX 914 shows, Medicare paid $468,629 to Downtown RX for Meloxicam, Migranal, Pennsaid, and Zegerid allegedly dispensed to Caldwell. Because Hassan was one of three owners of Downtown RX (PSR ¶ 14), his portion of ill-gotten gains is $156,209.67.

Similarly, the forfeiture money judgment should account for Medicare payments to Nile RX for Migranal, Pennsaid, and Zegerid allegedly dispensed to Caldwell. Medicare paid Nile RX $18,203.06 for Migranal, $15,757.38 for Pennsaid, and $6,984.50 for Zegerid, totaling $40,944.94.[5] According to the registration form the defendant submitted to the New York State Board of Pharmacies, the defendant was the sole owner of Nile RX. (GX 294 at 8.) Accordingly, the full amount of $40,944.94 constitutes the defendant's ill-gotten gains.

| Source of Ill-Gotten Gains | Amount |
| --- | --- |
| Cash paid to Hassan in exchange for filling Ratanaprasatporn-issued oxycodone 30 mg prescriptions across seven Hassan-owned pharmacies: Nile RX, Nile Ridge, Nile City, Downtown RX, Prospect Care, Forest Care, and Sunset Corner | $903,637.26 |
| Hassan's 33% share of Medicare payments to Downtown RX for Meloxicam, Migranal, Pennsaid, and Zegerid, for Myrtle Caldwell | $156,209.67 |

---

[5] The defendant has requested a forfeiture hearing. The government submits that a hearing is not necessary, because evidence admitted at trial and sworn witness testimony satisfies the preponderance of the evidence standard. However, if a forfeiture hearing is granted, the government reserves the right to seek additional forfeiture money exceeding the amounts sought here, and to offer additional evidence beyond what was admitted at trial.

| Hassan's 100% share of Medicare payments to Nile RX for Migranal, Pennsaid, and Zegerid, for Myrtle Caldwell | $40,944.94 |
| **TOTAL** | **$1,100,791.87** |

Therefore, the Court should impose a forfeiture money judgment of $1,100,791.87.

D. <u>Occupational Restrictions</u>

1. *Ban on Participating in Pharmacy Industry*

The government respectfully requests that the Court consider an occupational restriction precluding the defendant from participating in the pharmacy business in any capacity during the term of any period of supervised release the Court may order. <u>See</u> U.S.S.G. § 5F1.5(a); 18 U.S.C. § 3563(b)(5) (court may order defendant to "refrain . . . from engaging in a specified occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense . . .").

The ban on participation in the pharmacy business is entirely appropriate here. Without the ban, the defendant "would engage in the same sort of unethical, unprofessional and illegal behavior" as he did in the above-described scheme. <u>United States v. Simons</u>, No. 09-CR-10032 (MLB), 2012 WL 1473800, at *14 (D. Kan. Apr. 27, 2012); <u>see also, e.g.</u>, <u>United States v. Berridge</u>, 74 F.3d 113, 118-19 (6th Cir. 1996) (affirming employment ban in banking industry because prohibition will "assist" defendant "in avoiding the conditions that led him to commit his current offense"); <u>United States v. Skaff</u>, No. 17-CR-125 (JRG), 2017 WL 6390940, at *9 (S.D.W. Va. Dec. 14, 2017) (imposing ban on practicing dentistry because of criminal conduct— "fraudulent billing"—and defendant's "lack of professionalism in his practice").

The defendant ran an oxycodone trafficking scheme across at least seven of his pharmacies, and he has been participating in the criminal conduct since shortly after becoming a pharmacist himself. He also participated in health care fraud. By virtue of his extensive control over numerous pharmacies across this district through his concealed ownership interest in them, Hassan was able to manage the flow of unlawful oxycodone prescriptions being unlawfully dispensed across his pharmacy ring. By having his pharmacies split the number of Ratanaprasatporn prescriptions and shifting patients among the pharmacies, Hassan could ensure that no individual pharmacy would become an object of particular suspicion during the scheme. Hassan also repeatedly hid (and directed others to hide) the fact of his many pharmacy ownership stakes to prevent reviewing authorities from uncovering his scheme. Hassan hid his ownership interest in pharmacies by having his wife, Shorouk Hussein (<u>see, e.g.</u>, Tr. 1213), serve as nominal owner. He has continued to conceal his beneficial ownership of pharmacies by using his wife's name. (PSR ¶ 98 & n.6 ("[T]he company is in the defendant's wife's name. The defendant did not report investing in and/or owning this pharmacy. He also did not provide a business financial statement for this business.").)

The restriction "seems a reasonable way to protect the public from [the defendant's] practices and to channel [his] energies into a less destructive path." <u>United States v. Choate</u>, 101 F.3d 562, 566 (8th Cir. 1996). The defendant here should "not be trusted" with participating in the pharmacy industry, at least during the supervised release period, as he abused

the trust placed upon him by licensing boards and the public at large. See United States v. May, 568 F.3d 597, 608 (6th Cir. 2009) (affirming ban on "association with the Financial Services Industry, in any capacity whatsoever, except as a consumer" because defendant "used his position as head of a financial services company to embezzle money" and "could not be trusted with other people's money"); see also United States v. Henschel, 360 F. App'x 879, 879 (9th Cir. 2009) (affirming prohibition on "conduct[ing] any business" in entire industry because felony "aro[se] from" participation in particular aspect of industry); United States v. Sordillo, 38 F. App'x 32, 33 (1st Cir. 2002) (affirming prohibition on owning or operating any car repair shops because defendant operated illegal chop shop); United States v. Alexander, 743 F.2d 472, 481 (7th Cir. 1984) (affirming prohibition on "maintenance of an ownership interest in a scale business" where defendant convicted of fraud in connection with owning scale business).

### 2.  *Disclosure Requirements*

The government also respectfully requests that the Court impose certain notification requirements during the defendant's supervised release term. First, the Court should order the defendant to disclose to the New York State Board of Pharmacy and Probation, no later than 30 days after the start of his supervised release term and once a year after that for the duration of his term, the names of each pharmacy in which he holds a beneficial ownership interest, as well as the names of each pharmacy in which his wife holds any purported ownership interest; the percentage of any beneficial ownership interest; and the identities of all other individuals with beneficial ownership stakes in each such pharmacy. Second, the Court should order the defendant to disclose to the New York State Board of Pharmacy and Probation, no later than 30 days after the start of his supervised release term, the names of each pharmacy in which he or his wife held a beneficial ownership interest at any time since 2015 (the start of the above-described oxycodone scheme); the date range during which he or his wife held the interest; the percentage of any beneficial ownership interest; and the identities of all other individuals with ownership stakes in each such pharmacy at the time he or his wife held an interest.

The disclosure requirements are reasonably necessary to ensure that, during the supervised release term, the defendant is satisfying the above-requested condition of not engaging in the pharmacy business, and that appropriate reviewing authorities can properly track his rehabilitation and monitor compliance. Without appropriate disclosure requirements for the entirety of his supervised release term, there is reason to believe that he would re-engage with his confederates and attempt to circumvent any occupation restrictions imposed on him. These disclosure requirements also would help Probation in enforcing the above-described business ban. The disclosure requirements are, furthermore, directly tied to his misconduct.

Given the more than four-year duration of Hassan's drug trafficking operations and his related health-care-fraud scheme, along with his repeated efforts both to obscure his ownership interest in various pharmacies, and to conceal and prolong his role in the underlying

offenses, the above-described occupational restrictions are reasonably necessary to protect the public.[6]

IV.     Conclusion

For the reasons stated above, the government respectfully requests that the Court impose a Guidelines sentence, supervised release with occupational restrictions, as well as forfeiture of $1,100,791.87.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:     /s/
Laura Zuckerwise
Victor Zapana
Gilbert M. Rein
Claire S. Kedeshian
Assistant U.S. Attorneys
(718) 254-7000

cc:     Clerk of Court (AMD)
Defense Counsel
U.S. Probation Officer Alexandria Lohwasser

---

[6]     While such a restriction will offer specific deterrence for the period of supervised release, a significant prison sentence is still necessary to deter the defendant from recidivating following the conclusion of any period of supervised release.